# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 28, 2010

No. 07-40216

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

NOE TREJO,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY and DENNIS, Circuit Judges, and BOYLE,[*] District Judge.

JANE BOYLE, District Judge:

Noe Trejo appeals his conviction for conspiracy to commit "promotion" money laundering under the transportation prong of the federal money laundering statute, 18 U.S.C. §§ 1956(h) and 1956(a)(2)(A). Trejo pled guilty to the charge but now maintains that the factual basis for his plea is insufficient to establish that he had the "specific intent to promote" the underlying drug trafficking activity as required under the statute. Upon a review of the record, we agree that the facts supporting Trejo's guilty plea fall short of establishing

---

[*] District Judge of the Northern District of Texas, sitting by designation.

§ 1956(a)(2)(A)'s "specific intent to promote" element and that the district court, therefore, erred in accepting his guilty plea. Finding no plain error, we AFFIRM.

## I. BACKGROUND

Noe Trejo and Apolinar Villanueva were hired to transport large sums of money from Florida to Mexico. En route to their destination, in separate cars laden with the concealed cash, they caught the attention of a local sheriff's deputy, just outside of Beeville, Texas. The deputy took notice of the men as they traveled along the interstate in identical 2004 silver Ford Focus model vehicles, one behind the other, both cars missing their front plates. Intrigued, the deputy followed, eventually pulling them over for traffic violations. Under questioning by officers, the two visibly nervous men gave conflicting accounts of who they were, where they were headed, and why. Both denied illegal activity but agreed to let the officers search their vehicles. The searches yielded $330,426.56 in currency stashed in hidden compartments in the dashboards of both cars. In Villanueva's vehicle, officers additionally found two weapons.

Confronted with the cash, Trejo explained that he was being paid $1000 to transport the money from Lakeland, Florida, to Hidalgo, Mexico, at the direction of someone he knew only as "Jose." He disclosed that prior to the trip, he had dropped his car off at a Wal-Mart parking lot in Lakeland Florida so Jose could pick up the car and hide the cash. He said Jose placed approximately $180,000 cash in his car. He recounted that he began his trip from Florida to Mexico on September 22, 2006 and was in touch with Villanueva by cell phone along the way. For his part, Villanueva, who was questioned separately, admitted that he knew about the money and firearms concealed in his vehicle, and that the person to whom they belonged was involved in drugs. Villanueva confessed that he was moving the money from Lakeland, Florida to Michoucan, Mexico, for a person he knew only as "Cocho." Villanueva also admitted that he was traveling with Trejo from Florida to Mexico.

2

The two were arrested and later indicted for conspiracy to transport the $330,426.56 from the United States to Mexico with the intent to promote the carrying on of drug trafficking in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 1956(h).[1]  Trejo subsequently pled guilty to the money laundering conspiracy charge.[2]  Villanueva pled guilty at the same hearing.  A federal prosecutor proffered the following verbatim factual rendition at their plea hearing:

> ...If these cases were tried today, an agent from ATF and Bee County Sheriff's Department, on October 26th 2006. at 7:30 in the morning, a Deputy Pointer was on routine patrol there Highway 59 east of the Beeville.  He saw a vehicle, a silver 2004 Ford Focus that had no front license plate going 70 miles an hour down 59.  Well, what was interesting is it had no front license plate, but right behind it was another silver 2004 Ford Focus with no front license plate on it.  And they – and so he decided to look at what was happening.  Both of the vehicles – There was a DPS trooper on the side of the road, he had somebody pulled over with the emergency lights and everything, and these two cars whooshed by it, that's a violation, didn't slow down or take any precaution for the trooper that was on the side of the road, and so the deputy decided to investigate.  The deputy attempted to stop the vehicle when it was – after it had gone through a construction zone going 70 miles an hour.  He didn't stop them there, he was afraid of a dangerous situation, so he stops them right after the construction zone and starts to talk to the driver of the first vehicle.
>
> Now, when he started to talk to the driver, he noticed that he was extremely nervous.  And as they were standing there and speaking to him, he asked him, do you know the guy in the other car that looks like yours.  He goes, no, don't know him.  Both of those vehicles were from Florida, and as he spoke to the man he noticed that he was extremely nervous, he was having a lot of trouble finding his insurance, and very – and was showing all types of signs of nervousness with his body language. And Deputy Pointer contacted the trooper that was stopped on the side of the road and asked him to – told him about the other vehicle that had been speeding through the construction zone. And so the trooper when he finished that stop went around to stop the other vehicle.  When he stopped the other vehicle he spoke to that driver.  That driver was – Mr. Pointer was talking to Mr. Villanueva, and Mr. Villanueva said he didn't know the other people in the car that looked like his.

---

[1] Villanueva was charged in two other counts of the indictment with firearms violations.

[2] That same day, Villanueva pled guilty to the money laundering conspiracy charge as well as a firearms count.

Now, when the trooper stopped the second car, he was speaking to the other defendant, Mr. Trejo, and Mr. Trejo said he did know the person in the other car, that it was his ex-father-in-law. And so as the trooper continued to talk to Mr. Trejo, he noticed Mr. Trejo was having facial spasms, and told him he was on a trip down to the Valley – down in the Valley to see someone who had cancer, and they carried on a conversation. And Trooper Moore at that point noticed that there was a real heavy odor of air freshener. He spoke to the other people that were in the vehicle, and asked Gloria Jasso, who was in the vehicle and was also from Florida, why she was going to Mexico, if there was somebody that was sick or something. And she said no, that that wasn't the reason they were going. And then he spoke to another passenger, and he got several different stories about what was happening.

Now, as all of this is going on, both of the vehicles being stopped in tandem, both Trooper Moore and Pointer asked if they had anything illegal in the vehicle and both stated no, and they both asked for permission to search the vehicle. They noticed there were screws loose to the dashboard and some things that were re-painted. Subsequent to that, they found secret compartments in both vehicles in exactly the same place. There were bundles, two separate bundles of money, I can't remember exactly how much it was in each, but it was practically two equal parcels of money totaling $330,426.56, 167 in each of the vehicles in each of the compartments, secret compartments.

Both Mr. Villanueva and Mr. Trejo – Along with the money in Mr. Villanueva's was two weapons that was spoken about, Your Honor. And after Mr. Trejo received his Miranda warning, he talked to the agents and said that he know currency was hidden. He was transporting money from Lakeland, Florida, and being paid to do that. He was asked by a person named Jose, and Jose was contacting him on his cell phone, and he was to take that money to Hidalgo, Mexico.

Mr. Villanueva, after his Miranda warnings said that he knew that there was currency and firearms concealed in his vehicle. He knew that the person that this belonged to was involved in drugs. He knew that he was taking the money from Lakeland, Florida to Michoucan, Mexico, for a person he knew as Cocho – I think is how you pronounce it, Cocho. They knew that they had to declare the money. The asked if they had to declare the money when they got to the Border, and they weren't going to declare the money or guns. They knew that this was drug money, and that it was going into Mexico, and that – and that weapon that was named in the indictment, Your Honor, was a gun that would be delivered to people that were narcotics traffickers.

Trejo and Villanueva agreed on the record with the prosecutor's rendition of the facts. Trejo was later sentenced to 57 months in federal custody and a three-year term of supervised release.

Trejo appeals his conviction maintaining that, although he transported the drug money, the factual basis for his plea is insufficient to prove that he did so with the specific intent to promote the underlying drug trafficking activity as required under § 1956(a)(2)(A).

## II. ANALYSIS

### A. Effect of Appeal Waiver/Plain Error Review

As an initial matter, Trejo waived his right to appeal as part of his plea agreement. The Government correctly does not seek to enforce the waiver because a valid waiver of appeal does not bar review of a claim that the factual basis for a guilty plea fails to establish the essential elements of the crime of conviction. *United States v. Hildenbrand,* 527 F.3d 466, 474 (5th Cir. 2008) (citing *United States v. Baymon*, 312 F.3d 725, 727 (5th Cir. 2002)). Permitting appeal despite a valid waiver "protect[s] a defendant who may plead guilty with an understanding of the nature of the charge, but without realizing that his conduct does not actually fall within the definition of the charged crime." *Hildenbrand,* 527 F.3d at 474 (citing *Baymon*, 312 F.3d at 727). Thus, we consider Trejo's claim of factual insufficiency despite his waiver of appeal. Nonetheless, because Trejo did not present his factual sufficiency claim to the district court, we apply a plain error standard of review to his claim. *United States v. Marek*, 238 F.3d 310, 315 (5th Cir. 2001).

### B. Factual Basis for Guilty Plea

1. *Fed. R. Crim. P. 11(b)(3)*

Rule 11(b)(3)[3] requires a district court taking a guilty plea to make certain that the *factual* conduct admitted by the defendant is sufficient as a *matter of law* to establish a violation of the statute to which he entered his plea. Fed. R. Crim. P. 11(b)(3); *Marek*, 238 F.3d at 314 (construing Rule 11(f), the substantive predecessor to Rule 11(b)(3)). This, in turn, mandates that the factual basis be sufficiently specific to enable the district court to compare the conduct admitted by the defendant with the elements of the offense charged. *Id*. at 315. In assessing factual sufficiency under the plain error standard, we may look beyond those facts admitted by the defendant during the plea colloquy and scan the entire record for facts supporting his conviction. *United States v. Tullos*, No. 09-402292, 2009 WL 4885007, at *1 (5th Cir. Dec. 17, 2009) (citing *United States v. Vonn,* 535 U.S. 55, 74 (2002)).

Applied here, Rule 11(b)(3) compels us to determine whether there are sufficient facts in the record to establish that Trejo conspired to commit promotion money laundering under 18 U.S.C. §§ 1956(h) and 1956(a)(2)(A).[4]

---

[3]Fed. R. Crim. P. 11(b)(3) provides that "[b]efore entering a judgment on a guilty plea, the court must determine that there is a factual basis for the plea." Fed. R. Crim. P. 11(b)(3).

[4] Section 1956(a)(2)(A) provides in pertinent part:
> Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer . . . funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States- (A) with the intent to promote the carrying on of specified unlawful activity; . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(2).
> Section 1956(h), the conspiracy portion of the money laundering statute, provides:
> Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

18 U.S.C. § 1956(h)

This requires finding facts that establish that "the defendant: (1) conspired;[5] (2) to transport funds between the United States and another country; (3) with the intent to promote the carrying on of a specified unlawful activity."[6]  *United States v. Krasinski*, 545 F.3d 546, 549-50 (7th Cir. 2008) (*citing United States v. Pierce*, 224 F.3d 158, 162 (2d Cir. 2000)).  Because Trejo confines his factual insufficiency claim to "the intent to promote" element, our analysis will center solely on this component of the statute.  Accordingly, we must first navigate this uncharted territory to determine what evidence is needed to satisfy the "intent to promote" element of § 1956(a)(2)(A).  Then we must scour the record to determine if there are sufficient facts to satisfy the requirement in this case.

C. Proving Specific Intent To Promote

*1. Guidance from § 1956(a)(1)(A)(i)*

Whether proof of the "intent-to-promote" element in the transportation prong of the federal money laundering statute, 18 U.S.C. § 1956(a)(2)(A), is satisfied by the record in this case is not entirely clear under the existing case authority.  In fact, there are no cases from this circuit squarely addressing the quantum or nature of proof required to establish the "intent-to-promote" element in transportation cases under § 1956(a)(2)(A).  Nonetheless, some guidance may be derived from the money laundering statute itself and from cases construing the identical "intent-to-promote" language in the *transaction* section of the same statute, §1956(a)(1)(A)(i).[7]

---

[5] The conspiracy component in no way diminishes the Government's burden of satisfying the "intent to promote" element of § 1956(a)(2)(A). *United States v. Wade,* 356 F. App'x 704, 711 (5th Cir. 2009) (quoting *United States v. Purvis*, 580 F.2d 853, 859 (5th Cir. 1978)).

[6] The Supreme Court has held that there is no overt act requirement for a money laundering conspiracy. *Whitfield v. United States*, 543 U.S. 209, 214 (2005).

[7] Section 1956(a)(1)(A)(i) provides in pertinent part:
> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in

7

The "specific intent to promote requirement" has been called the "gravamen" of a § 1956(a)(1)(A)(i) violation. *United States v. Caricone*, 272 F.3d 1297, 1303 (11th Cir. 1999). To prove it, the Government must satisfy a stringent *mens rea* requirement. *United States v. Brown,* 186 F.3d 661, 670 (5th Cir. 1999). Essentially, the government must show the transaction at issue was conducted with the intent to promote the carrying on of a specified unlawful activity. *Id.* It is not enough to show that a money launderer's actions *resulted* in promoting the carrying on of specified unlawful activity. *Id.* Nor may the government rest on proof that the defendant engaged in "knowing promotion" of the unlawful activity. *Id.* Instead, there must be evidence of *intentional* promotion. *Id.* In other words, the evidence must show that the defendant's conduct not only promoted a specified unlawful activity but that he engaged in it *with the intent* to further the progress of that activity. *Brown*, 186 F.3d at 670. The justification for this rigorous *mens rea* requirement is that, in enacting the statute, Congress meant to create a *separate* crime of money laundering, discrete and apart from the underlying substantive offense. *United States v. Febus*, 218 F.3d 784, 790 (7th Cir. 2000) (citing *United States v. Jackson*, 935 F.2d 832, 841 (7th Cir. 1991); *United States v. Heaps*, 39 F.3d 479, 486 (4th Cir. 1994)). Strict adherence to this standard "helps ensure that the money laundering statute will punish conduct that is really distinct from the underlying specified unlawful activity and will not simply provide overzealous prosecutors with a means of imposing additional criminal liability any time a defendant makes benign expenditures with funds derived from unlawful acts." *Brown*, 186 F.3d at 670.

---

fact involves the proceeds of specified unlawful activity-(A)(i) with the intent to promote the carrying on of specified unlawful activity; . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1)(A)(i).

Section 1956(a)(2)(A) contains an identical specific intent requirement for *transportation* cases as its § 1956(a)(1)(A)(i) *transaction* counterpart. While the definitive case authority on specific intent derives from the *transaction* provision, it is safe to assume the requirement is no less rigorous under 1956(a)(2)(A). *See United States v. Huezo*, 546 F.3d 174, 179 (2d Cir. 2008) (noting the use of identical language in the transportation and transaction provisions of § 1956 is a strong indicator that they should be interpreted in the same manner). We conclude that the same stringent specific intent requirement applies in § 1956(a)(2)(A) cases. We now turn to the facts needed to prove it.

*2. Specific Intent - Nature of Proof*

Determining whether specific intent to commit promotion money laundering has been proven is necessarily a fact-bound inquiry frequently turning upon circumstantial evidence. *Brown*, 186 F.3d at 670; *see also United States v. O'Banion*, 943 F.2d 1422, 1429 (5th Cir. 1991) (quoting *United States v. Maggitt*, 784 F.2d 590, 593 (5th Cir. 1986)) ("Intent may, and generally must, be proven circumstantially."). Because of the myriad forms promotion money laundering can take, divining a factual criterion with any precision from the available cases can prove confounding. Adding to the difficulty is the varying procedural postures in which the cases and attending proof present themselves on appeal. Some are appealed after a full jury trial with all of the facts presented and a comprehensive record available for review. Other cases come before the court after a guilty plea with the factual proffer serving as the primary factual rendition.

Despite these obstacles to determining a precise standard of proof for specific intent under § 1956(a)(2)(A), we do nonetheless find some instruction from (a)(1)(A) and (a)(2)(A) cases where – as here – drug trafficking serves as the underlying criminal activity. More to the point, in both *transaction* and *transportation* cases involving promotion, courts have often relied on proof that the defendant was aware of the inner workings of and/or extensively involved in

the drug organization responsible for the criminal activity as circumstantial proof that he had the specific intent to promote its unlawful purpose.  To be clear, the cases to which we refer do not expressly stand for the proposition that evidence of a defendant's involvement in the underlying drug business is necessary to prove specific intent in drug transportation cases.  Yet, without expressly so holding, a review of those cases nonetheless reveals that it is precisely that type of proof (facts showing the defendant's involvement in and/or knowledge of the illegal organization) on which the courts – at least in part – relied in finding specific intent-to-promote.  Most significantly, these cases exemplify the courts' consistent reliance on some *additional evidence* beyond the bare transaction or transportation itself to infer specific intent.  Thus, it is to illustrate this common thread in these otherwise fact-specific cases that we refer to them in this opinion.[8]

---

[8] *See United States v. Dovalina,* 262 F.3d 472, 475-76 (5th Cir. 2001) (a transaction case in which this court circumstantially inferred the defendant's specific intent to promote a marijuana trafficking enterprise based on evidence including the defendant's possession of notebooks reflecting payments to himself and to his coconspirators from the drug proceeds, his direction of the purchase, his packing and shipping of 55-gallon barrels to store and ship the marijuana, and his frequent payments for airline tickets and other bills needed to ship the marijuana); *United States v. Krasinski*, 545 F.3d 546 (7th Cir. 2008) (a transportation case in which the Seventh Circuit inferred the defendant's specific intent to further the progress of the conspiracy from the defendant's role as a regular supplier and money-man for the Ecstasy organization); *United States v. Hurtado*, 38 F. App'x 661 (2d Cir. 2002) (a transportation case in which the Second Circuit sustained defendant's money laundering conviction for transporting cash across the Canadian border based on evidence including several intercepted conversations between defendant and another man regarding the importation of cocaine, proof the defendant lied about having a legitimate job, and proof he transported the cash in the same manner used by major cartels); *United States v. Richards,* No. 09-13179, 2010 WL 357528, at *1-*2 (11th Cir. Feb. 2, 2010) (a transportation case in which the Eleventh Circuit sustained defendant's conviction based on evidence that the defendant willingly joined the drug conspiracy and that he admitted to transporting cocaine and cash on multiple occasions for a major drug trafficker); *United States v. Topete*, No. 08-16249, 2010 WL 125845, at * 4 (11th Cir. Jan. 14, 2010) (a transaction case in which the Eleventh Circuit affirmed defendant's conviction noting the dealer regularly paid the defendant money for large quantities of fronted drugs, and that the defendant participated in the drug trafficking organization by proposing methods of operation to a co-conspirator with whom he dealt on a regular basis). *But see Bueno*, 585 F.3d at 850 (a transportation case in which this court sustained the defendant's money laundering conviction for transporting cash cross-country based on evidence including a videotape showing the defendant conceding that he knew he was

To sum up, where the specified unlawful activity is drug trafficking, many courts have relied upon facts showing that the defendant knew something about the inner workings of the drug organization to find that he intended to promote its purpose. In the drug money transportation context, this may be the only type of evidence available beyond the bare transportation itself. Oftentimes, this proof comes in the form of facts showing the defendant's direct involvement in the illegal enterprise thereby rendering it more likely that he intended to further its progress by his actions. This is not to say that the *type* of proof relied on in the above cases is essential in transportation cases involving drug trafficking. Circumstantial proof of intent does not lend itself to such narrow factual categories. Nor, on the other hand, does the commonality of proof in the foregoing cases mean that the presence of such facts will always support a finding of specific intent. Instead, the simple lesson from these cases is that evidence of a defendant's knowledge about the internal operations of a drug organization, for which he is engaging in § 1956(a)(2)(A) transportation activities, may and often is relied upon to establish his specific intent to promote the organization's purpose. This squares with the broader premise that the money laundering statute was directed toward conduct that is *distinct* from the underlying substantive crime because it contemplates that something more than the bare act of transportation is necessary to prove specific intent to promote. *Brown*, 186 F.3d at 670. And, requiring more proof, in whatever form, aligns

---

working with drug traffickers with whom he had met and who had given him the drug money for cross-country transport, that the traffickers had threatened him, and that he had falsely registered two cars that were not his to an address not his own, "along with other evidence"). It should be noted that *Bueno* involved a full jury trial. Consequently, the panel reviewing the case had a comprehensive view of the evidence at hand in deciding the whether there was enough to sustain his money laundering conviction. The "other evidence" referenced is not described. In light of the post-jury trial posture of the case as well as its panel's reliance upon "other evidence" not identified, the value of this case as a guide is not as compelling as the other cases cited.

11

with the stringent *mens rea* requirement imposed by Congress on money laundering offenses.

D. The Record Facts

With the foregoing discussion as a guide, we turn to Trejo's sole argument on appeal – that the factual basis for his guilty plea is insufficient to satisfy the specific intent requirement of § 1956(a)(2)(A). In reviewing this claim under a plain error standard, we examine the *entire* record for facts supporting Trejo's guilty plea. *Vonn*, 535 U.S. at 74-77. This includes the facts gleaned from the plea agreement and plea colloquy, the factual findings relied upon in the presentence report ("PSR"), as well as "fairly drawn" inferences from the evidence presented both post-plea and at the sentencing hearing. *United States v. Palmer,* 456 F.3d 484, 489 (5th Cir. 2006)*; Hildenbrand*, 527 F.3d at 474-75 (citing *United States v. Dyer*, 136 F.3d 417, 425 n.13 (5th Cir. 1998)). The indictment, if specific, is also fair game. *United States v. Bachynsky,* 949 F.2d 722, 730 (5th Cir. 1991).

The inculpatory facts of record drawn from the prosecution's factual proffer, the affidavit supporting Trejo's arrest, the plea agreement, the plea colloquy, the PSR, and the sentencing transcript unmistakably demonstrate that Trejo entered into a paid arrangement with a drug dealer named "Jose" to load Trejo's car with drug money and transport it from Florida to presumed traffickers in Mexico. Trejo willingly embarked on his assigned journey, accompanied by co-defendant Apolinar Villanueva. The men were stopped in Texas by suspicious law enforcement officials. Under questioning, both Trejo and Villanueva initially lied about their illegal activity, but ultimately conceded their true mission once confronted with the hidden cash. They confessed that they were hired by drug dealers to transport drug money to others in the drug business in Mexico. They supplied sketchy details about the person or persons who hired them, claiming to know them only as "Jose" and "Cocho." They gave similarly vague details about the individuals in Mexico to whom they were

12

delivering the cash. In an affidavit supporting their arrests, an IRS/CID agent described their actions as consistent with the manner in which experienced narcotics traffickers routinely launder drug money. During his plea colloquy, Trejo agreed that the prosecutor's factual rendition of his criminal conduct was correct.

Whether these facts suffice to satisfy the specific intent requirement of § 1956(a)(2)(A) is a novel question in this circuit. Common sense would seem to dictate that an individual who knowingly agrees to transport drug money between drug dealers necessarily understands that his actions will promote the drug business. But, as discussed, "knowing promotion" is not enough for a conviction under the federal money laundering statute. *Brown,* 186 F.3d at 670. Instead the facts must demonstrate that, in transporting the funds, Trejo not only promoted the underlying drug trafficking business but that his *intended purpose* in so doing – an end-goal, if you will – was to further the progress of the drug business. *Id.* In other words, there must be "more" than simply the bare act of knowingly transporting the drug money. Otherwise, every mere transportation of drug money in this manner would also qualify as a money laundering offense. *See generally United States v. Heaps*, 39 F.3d 479, 486 (4th Cir. 1994) ("[W]ere payment for drugs itself held to be a transaction that promoted the unlawful activity of that same transaction virtually every sale of drugs would be an automatic money laundering violation as soon as the money changed hands.").[9] Such a result would surely run afoul of Congressional intent to create an offense distinct from the underlying crime that generated the dirty money in the first place. *Id.* (citing *United States v. Edgmon*, 952 F.2d 1206, 1213-14 (10th Cir. 1991)). As such, we look for evidence beyond the bare act of transportation.

---

[9] We have held in other contexts that not all drug transactions, even repeated such transactions, necessarily constitute promotion money laundering. *Dovalina,* 262 F.3d at 472 ("A promotion money laundering offense cannot be established by evidence of a single buyer's repeated payments to a distributor.").

Here, the incriminating facts show simply that Trejo signed on for a one-time trip to transport drug money for a dealer he did not know and, except for the one trip, had never worked for in the past. Even after he was caught red-handed transporting the drug money and confessed to officers, Trejo provided only scant details of the man named "Jose" who hired him. Evidence regarding the inner workings of the organization that hired him – assuming that an operation even existed beyond "Jose"– is virtually nonexistent in the record. Similarly, the record lacks facts regarding the individuals to whom Trejo was delivering the money and the nature of their ongoing activities, if any, beyond the one delivery. Certainly, the possibility exists that Trejo was dishonest about the scope of his involvement and the extent of his knowledge.[10] Even so, under the narrow facts at hand, this "possibility" yields naught by way of proving Trejo's intent to promote. Further, Villanueva's admissions,[11] which mirrored Trejo's in vagueness, add nothing to the evidentiary mix. Nor can we credit the IRS/CID agent's affidavit describing Trejo's conduct as typical of an experienced drug trafficker/money launderer. We have cautioned against relying upon such "drug profiling" testimony to prove a defendant's mental state. *United States v. Ramirez-Velasquez*, 322 F.3d 868, 879 (5th Cir. 2003) (holding the agent's testimony as to what the drug courier *knew* violated Fed. R. Evid. 704(b) as improper opinion testimony on the ultimate issue). Finally, Trejo's on-the-record concession during the plea colloquy to the prosecutor's factual rendition establishes no more than his knowing transportation of the drug money.

In sum, Trejo's conduct in this case, while undoubtedly criminal in nature, does not amount to promotion money laundering. A generous view of the record

---

[10] Notably, the record seems to weigh against such a possibility. At Trejo's sentencing, Trejo's counsel argued Trejo possessed no additional knowledge regarding the drug organization, but rather Trejo was merely transporting the drug money. This argument was met by no objection or argument to the contrary on the part of the prosecution.

[11] Villanueva's story essentially boiled down to a man named "Cocho" who hired him to deliver drug money to drug dealers in Mexico.

facts and their fairly drawn inferences shows only that Trejo intended to transport the drug money for a fee. We are left to speculate how Trejo could have entered into the transportation activity intending to promote the underlying drug trafficking activity when he knew nothing about it, save that "Jose" asked him to transport drug money. Because the record is devoid of facts, circumstantial or otherwise, beyond the bare act of transportation, we conclude that the factual basis for Trejo's plea does not adequately support his conviction for promotion money laundering and that the district court erred in accepting his plea on the facts presented. The only remaining question is whether the error was plain. It was not.

E. Plain Error

As mentioned, Trejo never complained to the district court that the facts underlying his plea were legally insufficient. Rule 52(b) of the Federal Rules of Criminal Procedure permits an appellate court, under limited circumstances, to consider and correct errors otherwise forfeited by a defendant's failure to object. *United States v. Olano*, 507 U.S. 725, 731 (1993). By its terms, Rule 52(b) applies only to errors that are "plain" and "affect[] substantial rights." Fed. R. Crim. P. 52(b). In keeping with this exacting standard, the Supreme Court has identified four hurdles that must be cleared before a reviewing court can remedy a forfeited error. *United States v. Puckett*, 129 S. Ct. 1423, 1429 (2009) (citing *Olano*, 507 U.S. at 734-36). There must be (1) an error; (2) that is clear or obvious; and (3) affects the defendant's substantial rights. *Id.* Fourth and finally, once it is shown that an error is "plain" and "affects substantial rights," the court of appeals has the *discretion* to correct it but no obligation to do so. *Id.* (citing *Olano*, 507 U.S. at 736) (emphasis in original). In fact, the Supreme Court advises that the reviewing court ought to remedy the error *only* if it "'seriously affected the fairness, integrity or public reputation of the judicial proceedings.'" *Olano*, 507 U.S. at 735-36 (quoting *United States v. Atkinson*, 297 U.S. 157 (1936)) (emphasis added). It goes without saying that meeting all four

15

requirements "is difficult 'as it should be.'" *Puckett*, 129 S. Ct. at 1429 (quoting *United States v. Dominguez-Benitez*, 542 U.S. 74, 83 n.9 (2004)).

Having already determined that the district court erred in accepting Trejo's plea on the facts presented, we move to the question of whether the error was plain. Plain error is error that is "clear" or "obvious." *Olano*, 507 U.S. at 734. "At a minimum," establishing plain error requires a showing that the "error [was] clear under *current law*." *Olano*, 507 U.S. at 734; *United States v. Bishop*, 603 F.3d 279, 280 (5th Cir. 2010) (emphasis added). "Current law" is the law in place at the time of trial.[12] *United States v. Jackson*, 549 F.3d 963, 977 (5th Cir. 2008). An error is not plain under "current law" "if a defendant's theory requires the extension of precedent." *Id.* (internal citations omitted). Plain error is error so clear or obvious that "the trial judge and prosecutor were derelict in countenancing it, even absent the defendants timely assistance in detecting it." *United States v. Hope*, 545 F.3d 293, 296 (5th Cir. 2008) (quoting *United States v. Frady*, 456 U.S. 152, 163 (1982)). The error in this case simply does not reach that level.

Our own analysis belies any notion that the current law regarding Trejo's factual insufficiency claim is "clear." Variously describing Trejo's claim as "novel" and "not entirely clear under the existing case authority," we doom the case for plain error. This, despite *Brown, supra,* and the related transaction cases describing a "stringent *mens rea*" component in cases under § 1956(a)(1)(A)(i). Given the myriad factual and procedural variations involving promotion money laundering generally, it is by no means clear how *Brown*, a case involving a wheelchair scam, translates *factually* to cases like Trejo's involving drug money transportation. Even the litany of cases recited in note 8, involving promotion in the context of drug trafficking, offers few clues that the

---

[12] We have also found plain error under "current law" where the law at the time of trial was settled but is "clearly contrary" to the state of the law at the time of appeal. *United States v. Hope*, 545 F.3d 293, 296 (5th Cir. 2008).

facts supporting Trejo's plea were legally insufficient. As mentioned, although those cases rely on evidence beyond the bare drug transportation itself, none of them stand for the proposition that such evidence is required as a matter of law. Instead, the intent to promote issue addressed here has not been squarely addressed by this circuit – until now. Under these circumstances, neither the district court nor the prosecutor can be found 'derelict in countenancing' Trejo's plea and its factual underpinnings. For these reasons, we AFFIRM.

GRADY JOLLY, Circuit Judge, concurring in the result only:

I concur in the result reached by Judge Boyle under our plain error review. However, although the opinion is very well considered, I respectfully disagree with its conclusion that the facts are insufficient as a matter of law to sustain the guilty plea, even under the statute's strict *mens rea* requirement.

The record shows that at the time of arrest Trejo, along with his partner, was transporting over $330,000 from Florida to Mexico. It also shows that Trejo knew he was working for specific drug traffickers; that he knew he was transporting money derived from drugs and that he was delivering the money to persons residing in Mexico who were engaged in a drug trafficking network.

In finding a factual basis to support Trejo's guilty plea, the district court, like a jury determining guilt, was entitled to make "fairly drawn" inferences from undisputed facts. *United States v. Hildenbrand*, 527 F.3d 466, 475 (5th Cir. 2008). In this case, one such reasonable inference is that Trejo, having been entrusted to transfer hundreds of thousands of dollars from a drug dealer in the United States to a drug dealer in Mexico, had some substantial affiliation or connection with the underlying drug enterprise. The court also could reasonably infer that as a member—that is, an employee—of that enterprise, Trejo had an interest in the continuing success of the enterprise that was employing him. It is of course true that the majority's *speculation* that Trejo was a one-time mule

17

with no other connection to the drug trade is another inference that may be drawn from the evidence. But it is not the only reasonable inference—indeed, not even the most reasonable inference. It certainly is just as reasonable to infer, in the light of the record evidence, that his relationship with the drug enterprise was credibly established and that he intended to promote that enterprise so as to have continuing employment.

It is inevitable that in a case like this, where subjective intent is at issue, a district court will rely on circumstantial evidence and the inferences reasonably made from that evidence to find a factual basis for a defendant's guilty plea. Our cases recognize both the necessity and legitimacy of this approach, and I cannot conclude that the district court erred by doing so in this case. Thus, in my view, there is no error here, much less plain error.

Furthermore, because it was only necessary to decide whether the alleged legal error here was "plain," it is unnecessary to decide the law for this circuit on a *res nova* issue.

For these reasons, I respectfully concur in the result only.