# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
October 4, 2018

Lyle W. Cayce
Clerk

No. 17-20022

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

OAKEY CHIKERE,

Defendant - Appellant

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 4:15-CR-303-1

Before HAYNES, HO, and DUNCAN, Circuit Judges.

PER CURIAM:*

Oakey Chikere appeals his conviction for health care fraud and conspiracy to commit health care fraud. He contends that the government offered improper "overview" testimony, improper testimony about Chikere's state of mind, and that the cumulative effect of this testimony denied him a fair trial. Propriety of the trial aside, he further argues that the district court improperly applied a sentencing enhancement. U.S.S.G. § 2B1.1(b)(11)(C)(i)

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-20022

("If the offense involved . . . the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification . . . increase by 2 levels.").

We conclude that the government's overview testimony was not plain error, the government did not offer improper testimony about Chikere's state of mind, and that the cumulative error doctrine does not apply here. Furthermore, because we determine that imposing the sentencing enhancement was not plain error, we AFFIRM the judgment of the district court.

## I.

Medicare covers home health care services for those who need short-term care, but for whom it would be unnecessary or burdensome to go to a hospital or other medical facility. To get home health care, patients must meet with a physician who can determine whether the patient is eligible for home health care. Then, the physician refers the beneficiary to a home health care agency, which conducts its own evaluation. If the agency is satisfied that the beneficiary is qualified for and needs home health care services, it generates a "485 Form" that the physician signs to authorize home health care. Then, the home health care agency bills Medicare for the services it renders to the beneficiary.

One common fraudulent scheme in the home health care industry begins with a "marketer" or a "recruiter" working for a home health care agency who finds Medicare-eligible patients willing to essentially sell their Medicare Identification Numbers. Then, the patients go a clinic willing to sell 485 Forms—without a 485 Form, a home health care agency cannot bill Medicare. The agency pays the clinic for the 485 Form and then bills Medicare for services it never renders the patient.

No. 17-20022

This case involves such a scheme.  Ebelenwa Chudy-Onwugaje operated a home health care agency, Candid Health Care.  Chudy paid Angela Mcfarlane to recruit patients, and paid the patients for their information.  Chudy also paid Oakey Chikere—and his Direct Care Clinic—for each doctor-signed 485 Form he provided.  But Chikere and Direct Care did not have doctors actually examining patients.  Rather, Direct Care's manager Munda Massaquoi filled out 485 Forms for patients brought in by marketers.  Then, a doctor would come by at regular intervals to mass sign the 485 Forms.

Chikere was charged with health care fraud and conspiracy to commit health care fraud.  At trial, the government offered testimony from Lisa Garcia, Mcfarlane, Chudy, Massaquoi, and Sunday Joseph Edem.  Relevant to Chikere's arguments here, Lisa Garcia is an investigator for Health Integrity, which conducts fraud investigations for Medicare.  Garcia testified about how Medicare works and common fraudulent schemes she has seen in her investigations.  Chikere's counsel cross-examined her and established that her testimony did not explain the full range of legal practices in the home health care industry.

After the jury found Chikere guilty on all counts, the district court sentenced Chikere to 70 months in prison, three years of supervised release, and a $500 special assessment.  In addition, the court found Chikere and Chudy jointly and severally liable for $258,738 in restitution.

II.

Chikere objects to Garcia's trial testimony for two reasons:  (1) she gave impermissible overview evidence; and (2) she impermissibly addressed Chikere's state of mind.  Because Chikere did not object to Garcia's testimony, we review for plain error.  *See United States v. Flores-Martinez*, 677 F.3d 699, 710 (5th Cir. 2012).  To reverse the district court for plain error:  (1) there must be legal error; (2) that is clear or obvious; (3) affecting the appellant's

3

"substantial rights"; and (4) "if the above three prongs are satisfied, the court of appeals has the *discretion* to remedy the error—discretion which ought to be exercised only if the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Escalante-Reyes*, 689 F.3d 415, 419 (5th Cir. 2012) (en banc) (alteration in original) (quotation marks omitted) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).

Although some of Garcia's testimony was arguably inappropriate, the government offered enough evidence of Chikere's guilt that Chikere's rights were unaffected.

## A. Permitting Garcia's Overview Testimony Was Not Plain Error.

Chikere contends that Garcia provided impermissible "overview" testimony "to paint a picture of guilt before the evidence ha[d] been introduced." *United States v. Griffin*, 324 F.3d 330, 349 (5th Cir. 2003). Rather than merely explaining how Medicare works, Chikere asserts that Garcia offered her testimony on disputed issues of credibility. The government responds that even if the district court abused its discretion by allowing impermissible "overview" testimony—which it disputes—the government offered enough corroborating evidence that there is no plain error.

"Permitting a witness to describe a complicated government program in terms that do not address witness credibility is acceptable." *Id.* But to allow a witness to provide "tendentious testimony . . . would greatly increase the danger that a jury 'might rely upon the alleged facts in the [overview] as if [those] facts had already been proved,' or might use the overview 'as a substitute for assessing the credibility of witnesses' that have not yet testified." *Id.* (alteration in original) (quoting *United States v. Scales*, 594 F.2d 558, 564 (6th Cir. 1979)). Unlike summary witnesses, who provide a summary of evidence already presented to the jury, we are skeptical of the use of "overview"

witnesses because their testimony can prime the jury's view of the rest of the evidence.

Garcia offered her lay testimony about how Medicare works and common fraudulent schemes she has seen. Chikere objects to three specific exchanges. First, he contends that Garcia offered improper testimony about how clinics typically operate:

> Q. Now let's talk about clinic owners that open up clinics for diagnostic testing. Have you ever seen a clinic that is only there to serve as home health company referrals?
> A. No.
> Q. Would you say that's a functioning clinic?
> A. No.
> Q. Is there such a thing as a clinic that does not do any tests or any lab work or anything but only caters to a home health company?
> A. *No, I've never seen anything like that, not in my experience.*
> Q. *All right. Well, not legitimately, correct?*
> A. *Correct.*

While her testimony addressed part of the government's theory, it was otherwise permissible lay witness testimony based on Garcia's experience. *See* FED. R. EVID. 701; 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue.").

Second, Chikere points to an exchange about one of the billing records the government intended to use to show fraud:

> Q. So, in this scenario, they're always going to make the patient as sick as possible to get paid the maximum allowed amount?
> A. Unfortunately, yes, unless they have a very honest boss or a very honest agency.
> Q. *Right. So in this scenario, you know, we're looking at James Allen for 60 days in a scenario where it's fraudulent. He doesn't even need home health. And the government, Medicare, has paid two thousand dollars for really nothing to someone? Is that—*
> A. *That's probably very true.*
> Q. *And you see that—in your investigations, you see that over and over again?*

5

No. 17-20022

*A.   And the—probably the sadder part is that he only got—he probably only got seen nine times maybe in those whole 60 days.*

Not only did Garcia opine on facts that go beyond her lay opinion, the government asked Garcia to agree that something was "fraudulent." Chikere reasonably complains that the government improperly asked Garcia to testify about ultimate legal liability. *See, e.g., United States v. Espino-Rangel*, 500 F.3d 398, 400 (5th Cir. 2007) ("[A] non-expert witness may not offer legal conclusions."); *see also United States v. Gutierrez-Farias*, 294 F.3d 657, 663 (5th Cir. 2002).

Third, Chikere objects to a government "hypothetical," using facts from this case:

> Q.  Is it okay for someone who's just hypothetically, let's say, a lady by the name of Munda at the office of Direct Care, who's not even a P.A., seeing patients and taking notes, and there's no doctor and the doctor comes two weeks later to sign those forms—
> A.  No.
> Q.  —is that allowed?
> A.  No, that would not be appropriate.
> Q.  And that would just be like an office manager?
> A.  That would not be appropriate.

Unlike the first exchange—which is just lay opinion testimony—and the second exchange—which is arguably an impermissible legal conclusion—this exchange comes the closest to the ill that we recognized in *Griffin*: by using a name-specific "hypothetical" scenario, the government was priming the jury and coloring the rest of the testimony it would hear. *Griffin*, 324 F.3d at 349. But even this testimony does not make the kind of express credibility determination that we have found improper. *See, e.g., United States v. Price*, 722 F.2d 88, 90 (5th Cir. 1983); *see also United States v. Moore*, 997 F.2d 55, 59 (5th Cir. 1993) ("[The] *Price* [court] prohibited only an express statement by the expert that he believed the government's witnesses.").

6

Moreover, even if the district court abused its discretion by allowing impermissible overview testimony, that is not automatically plain error. *See Griffin*, 324 F.3d at 349. Here, there is overwhelming evidence of Chikere's guilt. Each of the government's witnesses provided testimony that supports Garcia's. *Id.* at 350 ("[T]he record indicates that [the] overview testimony . . . [was] supported by other witnesses' testimony and exhibits admitted into evidence. [The] testimony, viewed in light of the record as a whole, had little, if any, [e]ffect on the jury's verdict.").

Mcfarlane testified that she recruited patients for Candid and Direct Care, that she never saw a doctor examine a patient at Direct Care, and that Mundy filled out the patient paperwork at Direct Care. She even provided *video* of some of her interactions with Direct Care, including one showing Mundy filling out forms and one showing discussions with Chikere about recruiting patients for another doctor. Massaquoi corroborated Mcfarlane's testimony that Direct Care's patients came from recruiters and that Direct Care did not have doctors examining patients for the 485 Forms. Although Massaquoi did not testify that Chikere had an agreement with Direct Care, Chudy did. As payment, Chudy wrote checks—sometimes blank checks—to Chikere's nonprofit. She too testified that none of the patients identified at trial ever saw a doctor. Edem said that he acted as a consultant to Chikere, teaching him how to run a fraudulent clinic without raising Medicare's suspicion, which matches the typical fraudulent scheme that Garcia identified. He further testified that Direct Care was only set up to fraudulently certify patients for home health care.

At trial, Chikere's response to the government's witnesses was simply that they are all lying; Chudy donated to his ministry, nothing more. Chikere had the opportunity to cross-examine all witnesses for inconsistencies. And

here, Chikere contends that the government's witnesses had credibility problems because they all have been involved in Medicare fraud themselves.

In light of the overwhelming and consistent evidence of Chikere's guilt, we conclude that—even if there is clear legal error here—the error did not affect Chikere's substantial rights. *Id.*

## B.  Garcia Did Not Improperly Opine on Chikere's State of Mind.

"An expert in a criminal case may not [] offer 'an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged.'" *Gutierrez-Farias*, 294 F.3d at 662 (quoting FED. R. EVID. 704(b)).

Chikere argues that Garcia offered improper testimony about Chikere's state of mind.  Chikere points to two exchanges and a chart, none of which concern state of mind.  First, the government asked

> Q.  Is there any scenario where a home health owner should be paying a clinic owner?
> A.  No.

Much like her other testimony, Garcia offered her lay opinion about how clinics normally operate, not Chikere's state of mind.  Second, Chikere points again to the "hypothetical" about Massaquoi which does not address Chikere's state of mind.  Finally, Garcia offered a chart showing the steps in a typical home health care fraud scheme.  This too says nothing about Chikere's state of mind.  Moreover, it is distinguishable from the chart in *Griffin* because it was not offered by the government agent investigating the case and did not implicate Chikere or any of his co-conspirators.  *See Griffin*, 324 F.3d at 349.

None of these exchanges address Chikere's state of mind.  Rather, Garcia offered observations based on her experience as an investigator.  Thus, these exchanges work better as complements to Chikere's overview witness objection.  And they are subject to the same response:  even if it were an abuse

No. 17-20022

of discretion to allow the testimony, the district court did not commit plain error and certainly nothing warranting our discretionary reversal.

III.

Chikere further argues that the cumulative error doctrine requires reversal in this case. "[A]n aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998) (collecting authorities). "We have repeatedly emphasized that the cumulative error doctrine necessitates reversal only in rare instances and have previously stated en banc that 'the possibility of cumulative error is often acknowledged but practically never found persuasive.'" *United States v. Delgado*, 672 F.3d 320, 344 (5th Cir. 2012) (en banc) (footnote omitted) (quoting *Derden v. McNeel*, 978 F.2d 1453, 1456 (5th Cir. 1992) (en banc)). We are especially unlikely to apply the doctrine where "the government presents substantial evidence of guilt" or the defendant has only "demonstrated one possible harmless error." *Id.*

The purported errors in this case did not "so fatally infect the trial that they violated the trial's fundamental fairness." *Id.* at 344 (internal quotations omitted) (quoting *United States v. Fields*, 483 F.3d 313, 362 (5th Cir. 2007)). At best, Chikere can point to one example of improper overview witness testimony and one example of a witness *arguably* being asked to offer a legal conclusion. In addition to his substantive critiques of Garcia's testimony, Chikere argues that, "[b]ecause the underlying evidence had not been introduce[d], Chikere's ability to cross-examine the basis of [] Garcia's testimony and opinions was also limited." This is simply not supported by the record. Both the government and Chikere entered evidence into the record before Garcia testified dand Chikere had the ability to cross examine Garcia, which he did.

No. 17-20022

Especially when weighed against the overwhelming evidence of guilt and the weak evidence in his favor, there is no cumulative error here. *Id.* at 344.

IV.

Finally, Chikere challenges the district court's sentencing enhancement for "the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification." U.S.S.G. § 2B1.1(b)(11)(C)(i). Because Chikere forfeited this argument and there is no controlling law, we conclude that the district court did not commit plain error applying the enhancement.

Chikere failed to preserve error. "To preserve error, an objection must be sufficiently specific to alert the district court to the nature of the alleged error and to provide an opportunity for correction." *United States v. Neal*, 578 F.3d 270, 272 (5th Cir. 2009) (citing *United States v. Ocana*, 204 F.3d 585, 589 (5th Cir. 2000)).

Chikere's objections were not specific enough to alert the district court to the argument he makes before this court. He objected to the pre-sentencing report:

> Defendant should not be given a 2 level increase pursuant to U.S.S.G. § 2B1.1(b)(11)(C)(i) for using a means of identification unlawfully to obtain another means of identification. Defendant never did this.

At the sentencing hearing, Chikere's counsel said, "I don't think there's any— any evidence that he—that—using a means of identification unlawfully to obtain identification. I don't remember that happening at all at the trial. I don't remember any testimony of that nature." But before us, Chikere contends that he had permission to use the information and therefore the enhancement does not apply. These are different arguments, emphasizing different factual and legal grounds. Chikere's argument now is that his use can be unlawful but still authorized, a point he said nothing about in the

10

district court.  Chikere's vague objections were therefore ill-suited to alert the district court to the issue presented here:  § 2B1.1(b)(11)(C)(i)'s application to situations in which a person receives permission to use identification and does so unlawfully.

Because Chikere "has failed to make his objection to the guidelines calculation sufficiently clear, the issue is considered forfeited, and we review only for plain error."  *United States v. Chavez-Hernandez*, 671 F.3d 494, 497 (5th Cir. 2012) (collecting authorities).

Here, if the district court erred, such error would not be plain because there is no controlling law.  *See id.* (citing *United States v. Olano*, 507 U.S. 725, 732–36 (1993); *United States v. Infante*, 404 F.3d 376, 394 (5th Cir. 2005)).  "'At a minimum,' establishing plain error requires a showing that the 'error [was] clear under current law.'"  *United States v. Trejo*, 610 F.3d 308, 319 (5th Cir. 2010) (alteration in original) (citing *Olano*, 507 U.S. at 734).  Accordingly, we have declined to find plain error under similar facts.  What's more, one of our sister courts concluded that the guideline applied in an analogous case.

Section 2B1.1(b)(11)(C)(i) applies to the "unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification."[1]  Here, the question is whether the enhancement applies to a situation in which someone permits the use of her information for an unlawful purpose.

We have yet to definitively interpret § 2B1.1(b)(11)(C)(i).  But, in an unpublished decision, we concluded that "we cannot say it was *plain error* for the district court to find that [use of a social security number] to obtain a

---

[1] There is no dispute that the Medicare information here is a "means of identification," 18 U.S.C. § 1028(d)(7), and any fraudulent health care claims would be the "other means of identification."  *Id.*; U.S.S.G. § 2B1.1(b)(11)(C)(i), comment n.1.

driver's license was an unauthorized use of the social security number, regardless of whether [the defendant] had permission from the owner of the information to use the number for that unlawful purpose." *United States v. Morris*, 376 Fed. App'x 461, 462 (5th Cir. 2010) (per curiam) (unpublished) (emphasis added).

And our sister court has held that under § 2B1.1(b)(11)(C)(i), "the beneficiaries . . . could not have authorized submission of claims when they had no legal authority to do so. For that reason, . . . [even if] the beneficiaries testified that they consented to or permitted submission of claims, it would be of no consequence." *United States v. Gonzalez*, 644 Fed. App'x 456, 465 (6th Cir. 2016) (unpublished) (internal citations omitted) (citing *United States v. Mobley*, 618 F.3d 539, 547–48 (6th Cir. 2010)).

Without controlling precedent from this court and in light of other precedents, the district court did not commit clear error by applying the enhancement here.

V.

We therefore AFFIRM the district court's judgment.

12