# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 22, 2025

Lyle W. Cayce
Clerk

———————

No. 24-40109

———————

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

RONALD LEWIS MCGUIRE,

*Defendant—Appellant*,

CONSOLIDATED WITH

———————

No. 24-40111

———————

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

PHILIP S. LALA,

*Defendant—Appellant*,

CONSOLIDATED WITH

———————

No. 24-40117

_____

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

CHRISTOPHER SHAUN RAGLE,

*Defendant—Appellant,*

CONSOLIDATED WITH

_____

No. 24-40139

_____

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

LOWELL EUGENE SARGENT,

CONSOLIDATED WITH

_____

No. 24-40299

_____

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

ERIC RYAN ROBERTS,

2

*Defendant—Appellant.*

———————————————————

Appeal from the United States District Court
for the Eastern District of Texas
USDC Nos. 4:20-CR-314-3,
4:20-CR-314-6, 4:20-CR-314-7,
4:20-CR-314-5, 4:20-CR-314-1

———————————————————

Before KING, SMITH, and DOUGLAS, *Circuit Judges*.

ON PETITION FOR REHEARING

DANA M. DOUGLAS, *Circuit Judge*:

The petitions for panel rehearing filed by McGuire and Sargent are GRANTED. The prior opinion, *United States v. McGuire*, 151 F.4th 307 (5th Cir. 2025), is WITHDRAWN, and the following opinion is SUBSTITUTED.

In 2021, a grand jury charged Eric Roberts, Ronald McGuire, Lowell Sargent, Christopher Shaun Ragle, and Philip Lala, alongside ten co-defendants, in a six-count superseding indictment for their respective roles in a large drug-trafficking organization. The scheme was simple: the defendants would purchase marijuana from states in which it had been legalized, often California and Oregon, and distribute it throughout twenty-one other states. The five appellants went to trial—where eight of their co-defendants testified against them—and all were convicted of conspiracy to commit money laundering and conspiracy to possess with intent to distribute marijuana, among individualized charges. The five appealed, challenging their convictions and sentences. For the reasons that follow, we AFFIRM IN PART, VACATE IN PART, and REMAND.

## I. BACKGROUND

### A. The Scheme

3

24-40109
c/w Nos. 24-40111, 24-40117, 24-40139, 24-40299

In June 2017, Nicholas Simonds began distributing medical marijuana in California. His business remained profitable for about six months, but collapsed when California legalized recreational marijuana. So, in March 2018, he moved to Texas. There, he met Eric Roberts, who was interested in CBD production.[1]

Although they wanted to work together, they quickly realized that CBD production was not profitable. Knowing that Texas was unlikely to legalize THC, they agreed to import marijuana from California, purchasing from Simonds's sources and selling to Roberts's customers. They originally shipped the drugs in small parcels but soon transitioned to driving larger quantities because mailing the drugs was too risky.

They first sent Lowell Sargent, one of Roberts's employees who installed security systems, to transport the narcotics. He would drive to California or Oregon, collect the drugs, and return them to Roberts's home in Texas. Among cannabis-related goods, Roberts sold marijuana, THC cartridges, and THC edibles. As the scheme grew, he recruited new drivers, including his four co-appellants and various other charged defendants.

Eventually, the California sellers "approached [Roberts and Simonds] to be essentially a transport option for their products." They charged $100 per pound of marijuana and $1 for each THC cartridge. The deliveries spanned twenty-one states, with each trip containing a minimum of $10,000 of product from the sources. The drivers would use vans purchased in the name of Roberts's car sales business.

---

[1] CBD and THC are both naturally occurring chemicals in the marijuana plant, *see Medical Marijuana, Inc. v. Horn*, 145 S. Ct. 931, 936 (2025), but CBD is not a controlled substance. *See* Agriculture Improvement Act of 2018, Pub. L. No. 115-334, § 10113, 132 Stat. 4490, 4908 (2018) (reclassifying "hemp," the plant Cannabis sativa L and its associated parts, as an agricultural commodity so long as its THC content is below 0.3%).

4

Roberts and Simonds communicated with the drivers almost exclusively through Signal, a phone application that uses encrypted messaging. Signal has several functions insulating it from detection, including an automatic-deletion function, which removes all messages after a period chosen by the user. The co-conspirators capitalized on this, with one testifying that it protected them from phone seizures because "it would delete everything prior[] and there would be no record of it." The messages featured code words such as "units" and "bags," meaning pounds of marijuana, and "paper" or "paperwork," meaning cash proceeds. To prevent detection, they never used banks or other financial institutions.

Drivers typically went on multi-city, multi-day runs.[2] Essentially, once Roberts or Simonds assigned a driver to a trip, Roberts would provide the name of the destination city. The driver would receive between $1,500 and $2,000 for hotels, food, and gas for the trip, and leave in a van preloaded with drugs. The money came from previous deliveries: Roberts and Simonds covered the operation's overhead with the cash receipts and split the remaining profits evenly.[3] Once the driver reached the assigned city, Roberts or Simonds provided the delivery address.

The drivers would either pick up marijuana or exchange it for money, normally at a residence but sometimes in public parking lots. They delivered to "interesting characters," who, according to co-defendant Brandon Thurman, "definitely didn't look like they stepped out of Sunday school." These individuals would usually give "a first name, but that would be it."

_____

[2] During multi-city runs extending more than one day, drivers were instructed to leave the drugs in the van, but to keep the car close so they could keep an eye on it. Drivers were ordered not to keep the cash in the van.

[3] Over the course of the conspiracy, Roberts reported "no wages . . . to the Texas Workforce Commission."

The drivers would then return to one of various locations, including Roberts's residence on Aintree Circle in Dallas, Texas ("the Aintree residence"). Thurman testified that he made between nine and twelve runs for the organization and delivered money to Roberts five or six times. He brought money to a house on Winton Street and the Aintree residence. When delivering the cash, he informed Roberts which run produced which proceeds. Another co-defendant, Paul Seward, testified that he would bring money to multiple locations, including both residences and a warehouse on Mañana Drive. Seward once counted the vacuum-sealed cash, which totaled $475,000, before delivering it to Roberts.

Drivers were paid between $500 and $1,200 per day of driving. They were ordered not to carry guns or travel by drug corridors. They did not receive bills of lading or any other paperwork relating to their cargo, nor did recipients ever sign for deliveries. Instead, they carried only boxes and duffel bags full of marijuana. Some claimed that the pervasive scent of marijuana made it obvious what they were transporting. Seward testified that he could smell the odor from the driver's seat, while others complained about the scent more generally.

## B.    Investigations

In 2019, the Narcotics Unit of the Mesquite Police Department began investigating co-defendant Christopher Terry, believing that he was trafficking marijuana and other THC products from California to the Dallas-Fort Worth metroplex. Terry worked with several people, including his girlfriend, co-defendant Sidney Greenwood, who stored and distributed drugs. Officers surveilled Greenwood's apartment and witnessed the pair engage in suspicious behavior at both a house on Winton Street and a storage unit. They obtained and executed a search warrant of her apartment, where

6

they seized $25,153 in cash, more than thirty kilograms of marijuana, and various firearms and other narcotics.

Soon thereafter, in July 2020, Deputy Julian Armijo of the Cibola County, New Mexico, Sheriff's Office was monitoring Interstate 40 in New Mexico when he observed a white van, driven by McGuire, traveling eastbound, speeding, and following a vehicle too closely. He conducted a traffic stop. Although Armijo intended only to issue a written warning, McGuire informed him that he was transporting servers for Wells Fargo. Armijo requested a bill of lading, and McGuire provided paperwork that appeared fake. McGuire stated that he worked for Roberts Elite Group. Armijo then told McGuire that he was free to leave, but asked if he was willing to answer more questions. McGuire assented. Another officer, Nicholas Jackson of the Bureau of Indian Affairs, then arrived, and he and Armijo asked whether they could look inside the van. McGuire declined, claiming that he had no access to the van's bed. The officers then deployed their K-9 unit, which alerted to the presence of narcotics, and they searched the van, accessing the bed through an unlocked back door.

The officers seized approximately 112 kg of marijuana, $13,000 in cash, and 1.246 kg of THC vapes and edibles. They detained McGuire and transported him to the Sheriff's Office. He was released after the Department of Homeland Security declined to prosecute him.

In August 2020, Officer Nicholas Blake of Junction City, Kansas's police department was patrolling Interstate 70, a drug corridor, with his K-9 unit. Blake conducted a traffic stop of a speeding white van, driven by Seward, that was following the car in front of it too closely. Because Seward refused to answer routine questions, Blake deployed his drug canine around the vehicle, which alerted to the presence of narcotics. Officers searched the van and discovered that "the whole cargo area was full of U-Haul boxes

containing marijuana or marijuana-related items." The van also contained a receipt for new tires in Lala's name and an oil change in McGuire's name. Insurance information was in Roberts's name, and the van's documentation identified Roberts Elite Group as its owner. The boxes contained 492.14 kg of marijuana and $1,696 in cash.

Seward was transporting the marijuana from California to a destination as instructed. He estimated the load weighed "about 2,100 pounds"—the most he had ever put in the van—and explained that some of the boxes had opened, packages had fallen out, and he could smell the drugs. He contacted Simonds, someone posted his bond, and Lala retrieved him.

Investigators soon shifted their focus to Roberts. On August 5, 2020, they watched him arrive at a warehouse on Mañana Drive, where he unloaded duffel bags and a box. Co-defendant Larry Clark, who had previously been surveilled, arrived in a sedan and departed in one of Roberts's transit vans. Officers followed Clark to his residence, where he unloaded several totes and co-defendant Robert Curlee arrived. After Curlee departed with a bag, officers conducted a traffic stop of his vehicle. A search produced 3.628 kg of marijuana, sheets of THC, and THC edibles.

Police then obtained and executed a search warrant of Clark's residence. They found 37.28 kg of marijuana, 3.818 kg of THC gummy edibles, 9.618 kg of THC oil vape cartridges, 507.7 grams of THC wax, and 85.7 grams of Psilocybin (psychoactive) mushrooms. During a separate traffic stop of Clark's vehicle, officers recovered 8.14 kg of marijuana. Clark admitted to selling between one and two pounds of marijuana per week for two years to supplement his income, and identified Roberts as his supplier. He also stated that Roberts loaned him the van because his car could not fit the containers of marijuana. Officers found photographs of marijuana and

8

other narcotics in Clark's phone, and connected his messages, which discussed transporting "paperwork," to Roberts's scheme.

Over the next couple of days, investigators searched the Aintree residence, the Mañana warehouse, and a storage unit on Denton Drive. The Aintree residence contained 1.055 kg of THC gummy edibles, 5.68 grams of THC oil, $255,364 in cash, and thirty-four total firearms. Officers also found drug ledgers, silencers, and a safe with cash and several guns. Other money was separated and placed in a box inside the same safe. The officers regarded this as consistent with drug-trafficking, and Roberts later admitted to the link between the proceeds and the drug-trafficking operation.

At the Mañana warehouse, the Roberts Elite Group's operational headquarters, officers discovered a vacuum sealer,[4] McGuire's backpack (which contained a handgun and identification), and various other firearms and marijuana-related goods. In total, they recovered 812.8 grams of THC wax, 355.3 grams of Psilocybin mushrooms, 3.22 kg of marijuana in pre-rolled cigarettes, 1.064 kg of THC gummy edibles, 31.327 kg of marijuana, two firearms, and $1,870 in cash.

At the Denton Drive storage unit, officers found black-and-yellow totes and additional cardboard boxes containing 73.828 kg of THC oil vape cartridges, 226.313 kg of THC gummy edibles, 1.441 kg of Psilocybin mushrooms, 2.156 kg of THC oil, 35.749 kg of marijuana, and 107.045 kg of marijuana in pre-rolled cigarettes. Roberts had moved the substances from the Mañana warehouse to the storage facility in case law enforcement raided the warehouse.

---

[4] Vacuum sealers were also discovered at other stash houses and locations.

24-40109
c/w Nos. 24-40111, 24-40117, 24-40139, 24-40299

Officers also seized Roberts's cell phones.  The lead investigator, Philip Offutt, analyzed the contents, created a spreadsheet summary of those contents (Government Exhibit 190), and testified regarding the quantity of drugs for which each co-appellant was responsible.  He concluded that the scope of the conspiracy exceeded 23,000 kg of marijuana.

## C.  PROCEDURAL HISTORY

In 2021, a grand jury returned a superseding indictment in the Eastern District of Texas against each of the five appellants in this matter—Roberts, McGuire, Sargent, Ragle, and Lala—alongside ten co-defendants.  It detailed six counts:

(1) 21 U.S.C. § 846, Conspiracy to Possess with the Intent to Distribute Marijuana [All Appellants]

(2) 21 U.S.C. § 848(a), Continuing Criminal Enterprise ("CCE") [Roberts]

(3) 18 U.S.C. § 1956(h), Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i), (a)(1)(B)(i), (a)(2)(A), and (a)(2)(B)(i) [All Appellants]

(4) 18 U.S.C. § 924(c), Possession of a Firearm in Furtherance of a Drug Trafficking Crime [McGuire]

(5) [Not Relevant to Appeal]

(6) 18 U.S.C. § 924(c), Possession of a Firearm in Furtherance of a Drug Trafficking Crime [Roberts]

10

The five appellants went to trial, and eight co-defendants pleaded guilty.[5]  Following an eight-day trial, the jury convicted all five appellants of conspiracy to possess with intent to distribute 1,000 kg or more of marijuana (Count 1) and conspiracy to commit money laundering (Count 3).  Roberts was convicted of CCE (Count 2) and possession of a firearm in furtherance of a drug-trafficking crime (Count 6), while McGuire was acquitted of possession of a firearm in furtherance of a drug-trafficking crime (Count 4).

At sentencing, the district court orally dismissed Count 1 as to Roberts and sentenced him to terms of imprisonment of 240 months on Count 2, 120 months on Count 3 (concurrent to Count 2), and 120 months on Count 6 (consecutive to the other Counts, as required by statute).  McGuire was sentenced to 188 months' imprisonment as to each of Count 1 and Count 3, to be served concurrently.  Sargent received a sentence of 120 months' imprisonment for each of Counts 1 and 3, to be served concurrently.  Ragle was sentenced to 60 months' imprisonment on each of Counts 1 and 3, to be served concurrently.  And Lala was sentenced to 48 months' imprisonment on each of Counts 1 and 3, to run concurrently.  The five co-defendant-appellants timely appealed, raising nine distinct issues.

## II.   Rule 1006 Challenge

First, Sargent and McGuire challenge the admission of Government Exhibit 190 in evidence.  Exhibit 190 is a spreadsheet, created by lead detective Offutt, detailing the deliveries that he attributed to each driver based on their Signal conversations.  On page 13 of the exhibit, Offutt created a chart based on what he considered the "complete" data—that showing the drug quantities of all trips—which calculates the average trip's weight as 506

---

[5] Two co-defendants, Wickham Simonds and Thomas Garza, were fugitives at the time of trial.

lbs. He then multiplied that average by each defendant's number of "trips"—a value he failed to explain—to determine the quantity of drugs moved by each individual. At times, he did so in lieu of attributing known drug quantities, instead assuming that every trip weighed 506 lbs. McGuire and Sargent each argue that the district court erred by admitting Exhibit 190 because it lacks sufficient accuracy to its underlying records under Federal Rule of Evidence 1006.

### A.    Standard of Review

Before considering whether Exhibit 190 satisfies Rule 1006, we must determine the proper standard of review. McGuire and Sargent both argue that, during trial, Roberts objected to Exhibit 190 because there was not a proper predicate for admissibility under Rule 1006. It is sufficient, in a case with multiple defendants, for one party to object on behalf of all. *See United States v. Portillo*, 969 F.3d 144, 178 n.4 (5th Cir. 2020) ("[A] defendant's failure to object is 'excused' if his co-defendant objects, since an additional 'motion or objection would have been a useless formality.'" (quoting *United States v. Love*, 472 F.2d 490, 496 (5th Cir. 1973))). Therefore, we ask whether Roberts's objection sufficiently encapsulated the arguments on appeal to preserve the issue. It did not.

McGuire and Sargent cling to the objection's argument that the Government failed to lay a proper predicate for the introduction of the spreadsheet. But during Roberts's *voir dire* examination of Offutt, he focused on an entirely different issue: how many pages of Roberts's phone's extraction report Offutt reviewed. He asked whether Offutt "look[ed] at . . . all of the 80,000 pages" and whether the chart was "representative of all of those messages." Offutt answered that he did not review all 80,000 pages and that he based his chart solely on the information that he did review. Roberts then objected, claiming that "the proper predicate and a correct

predicate [had not] been laid for the introduction of the spreadsheet" or documents created based on the spreadsheet. On continued direct examination, Offutt explained that much of the cell phone's extraction report was irrelevant, including Roberts's personal messages. Instead, he focused on key phrases and individuals related to the drug-trafficking organization.

Roberts then continued *voir dire*, arguing that the chart was "not based on the entire content of the phone" and that Offutt "didn't look through all of the 80,000" pages of the extraction report. Offutt again explained that he looked only at "the content that was relevant to our case," and that the report included "settings features," "emails," "web search history," and various other information irrelevant to the investigation. Roberts concluded: "I just don't think it fits under [Federal Rule of Evidence] 1006."

A preserved evidentiary ruling is reviewed for abuse of discretion. *See United States v. Brown*, 7 F.3d 1155, 1163 (5th Cir. 1993). But to preserve an issue for appeal, Federal Rule of Evidence 103 requires a party to timely object and "state[] the specific ground, unless it was apparent from the context." FED. R. EVID. 103(a)(1); *see also Dall. Gas Partners, L.P. v. Prospect Energy Corp.*, 733 F.3d 148, 157 (5th Cir. 2013) (requiring a party to raise an argument "to such a degree that the district court has an opportunity to rule on it" (quoting *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 339–40 (5th Cir. 2005))). The rules are clear: the *specific ground* must be pressed, not just the evidentiary rule. *See, e.g.*, FED. R. EVID. 103(a)(1); *Puckett v. United States*, 556 U.S. 129, 135 (2009) (explaining that Federal Rule of Criminal Procedure 51(b) requires the party to inform the court of the grounds for their objection); *United States v. Brace*, 145 F.3d 247, 266 (5th Cir. 1998) (en banc) (DeMoss, J., dissenting) (acknowledging that "a specific objection may be necessary to preserve an objection to an evidentiary ruling").

13

Both McGuire and Sargent challenge Exhibit 190's admissibility on the grounds of mathematical accuracy. These arguments do not fall within Roberts's narrow objection, even if McGuire and Sargent challenge the exhibit's accuracy under the same Rule. "To be sure, '[w]e have never required a party to express its objection in minute detail or ultra-precise terms.'" *United States v. Lerma*, 123 F.4th 768, 772 (alteration in original) (quoting *United States v. Pineiro*, 470 F.3d 200, 204 (5th Cir. 2006)). But the district court must be on notice of the issue. Neither appellant maintains that Exhibit 190 should have been excluded because Offutt did not review the entire extraction report, nor did Roberts's objection claim that the summary chart "incorrectly presented" information "riddled with math and logic errors." Plain error controls.

Plain-error review involves four steps. First, the appellant must demonstrate that the district court erred. *Puckett*, 556 U.S. at 135. Second, that error must have been clear and obvious, or not subject to reasonable dispute. *Id.* "Third, the error must have affected the appellant′s substantial rights, which in the ordinary case means he must demonstrate that it 'affected the outcome of the district court proceedings.'" *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). Fourth, this court has the discretion to reverse the error, but it "ought to be exercised only if the error '"seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."'" *Id.* (alteration in original) (quoting *Olano*, 507 U.S. at 736). "Meeting all four prongs is difficult, 'as it should be.'" *Id.* (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9 (2004)).

## B.    Applicable Law

Rule 1006 governs admission of a summary, chart, or calculation that proves the content of "voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006 (2011).

14

The underlying material must be available to other parties for examination. *Id.* And for the chart to "prove the content of voluminous" materials, *id.*, it must be accurate. *See United States v. Scales*, 594 F.2d 558, 563 (6th Cir. 1979) ("Of course even under Rule 1006, the summary or chart must be accurate, authentic[,] and properly introduced before it may be admitted in evidence.").

To admit a summary chart under Rule 1006, the proponent must demonstrate that: (1) it is based on competent evidence that is before the jury; (2) the evidence is available to the other side for comparison so that correctness may be tested; (3) the chart preparer is available for cross-examination; and (4) the jury receives a proper instruction. *United States v. Spalding*, 894 F.3d 173, 185 (5th Cir. 2018) (quoting *United States v. Bishop*, 264 F.3d 535, 547 (5th Cir. 2001)).

"Courts must be cautious with Rule 1006 charts." *Id.* "'[B]ecause summaries are elevated under Rule 1006 to the position of evidence,' we have warned, 'care must be taken to omit argumentative matter in their preparation lest the jury believe that such matter is itself evidence of the assertion it makes.'" *Id.* (alteration in original) (quoting *United States v. Smyth*, 556 F.2d 1179, 1184 n.12 (5th Cir. 1977)). This court has "therefore found reversible error where the [G]overnment 'attempted to use a summary chart to prove an element that it otherwise had not established.'" *Id.* (quoting *United States v. Ocampo-Vergara*, 857 F.3d 303, 310 (5th Cir. 2017)). And, crucially, "[t]he [G]overnment *cannot* use a 'summary' chart under [Rule] 1006 'to assume that which it was required to prove beyond a reasonable doubt as operative facts of the alleged offense.'" *United States v. Hart*, 295 F.3d 451, 459 (5th Cir. 2002) (quoting *United States v. Taylor*, 210 F.3d 311, 316 (5th Cir. 2000)).

15

24-40109
c/w Nos. 24-40111, 24-40117, 24-40139, 24-40299

C.    Plain-Error Analysis

1.    *Whether the Court Erred*

We first consider whether the court erred in admitting the chart under Rule 1006.  Both McGuire and Sargent challenge the mathematical accuracy of Offutt's calculations, and McGuire alleges that Offutt failed to identify which Signal conversations produced certain values.  We consider Exhibit 190's calculations in McGuire's factual context.

Exhibit 190 represents that McGuire "made at least 22 trips," with weights specifically attributed to six "deliveries."[6]  Summing these values up, McGuire was responsible for a known value of 764 lbs. of marijuana and 500 "pens."[7]    Neither McGuire nor Offutt attributed the 247 lbs. of marijuana seized during the New Mexico traffic stop to his "known" values.  But Offutt then applied his calculated "average" weight of 506 lbs.—which he calculated from all trips by all drivers—to McGuire's predicted "trips," yielding 11,132 lbs. of marijuana.  He did so regardless of whether he knew the trip's drug quantity.

On direct, Offutt explained that he calculated the average by "dividing the total average weight by the number of trips."  McGuire points to this testimony as a clear mathematical error because dividing the "total average" by the number of trips would provide a meaningless number.  But Offutt clearly misspoke.  And there are more significant issues in this summary chart, including Offutt's acknowledgement that, as it related to the unknown

_____

[6] Offutt did not explain the distinction between "trips" and "deliveries."  Sargent suggests that Offutt may have created "trips" by grouping deliveries based on Roberts's messages with his sources.  The Government did not elicit testimony explaining this distinction, nor does Exhibit 190 do so.  We take Sarent's suggestion and refer to "deliveries" and "trips" separately on this basis.

[7] McGuire's brief calculates this value differently.

trips, he was simply "making a guesstimate" of the appellants' drug quantities. We explore some of those mathematical inaccuracies.

First, summing all drivers' *known* deliveries, of which there are thirty-three, reveals a total of 4,079 lbs. That produces an average weight of 123.61 lbs. per drive, rounding up. So, if this was Offutt's method, his calculations were incorrect, unless there is some underlying data in the chart that is not clearly available.

Another area of Offutt's spreadsheet contained "all known quantities delivered by the group." It is possible that he grouped those deliveries into multi-city trips and provided a weight for the total trip. But such a methodology produces 552.93 lbs. per trip. Again, then, if this was Offutt's methodology, his calculations were incorrect. But there is no way to test his calculations' accuracy without more information. Interestingly, nowhere in that portion of the document did Offutt identify the drivers of each trip.

Moreover, Offutt's calculations in that section, titled "Conversations with sources," are questionable at best.[8] That chart includes smaller quantities of drugs in a left-hand column. A right-hand column shows his calculated quantities for each trip, which were calculated from the smaller

_____

[8] McGuire argues that this inferential chart "appears to be pictorial representations of hearsay testimony offered through Detective Offutt." The statements were not hearsay under multiple rules. *See* FED. R. EVID. 801(d)(2)(A) (excluding any statements made by the defendants in the Signal messages); FED. R. EVID. 801(d)(2)(E) (excluding statements "made by the party's coconspirator during and in furtherance of the conspiracy"). While some of the individuals named in the spreadsheet were not charged co-conspirators, there is no such requirement in Rule 801(d)(2)(E), so long as the court is satisfied by a preponderance of the evidence that the declarant was involved in the conspiracy. *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Postal*, 589 F.2d 862, 886 n.41 (5th Cir. 1979) ("[I]t is not necessary that the conspiracy upon which admissibility of the statement is predicated be that charged."). Although there is no competent challenge to the sources' involvement in the conspiracy, the messages make clear that the declarants were involved in the conspiracy.

"delivery" quantities in the left-hand column. But Offutt miscalculated at least seven of those trip quantities, and in two of them, the exhibit does not clearly contain all underlying terms. Even more concerningly, Offutt *excluded* various "trips" present in the left-hand column from the right-hand "total" column. These values were, therefore, not part of his ultimate "average" calculation. If we were to recalculate Offutt's mathematical errors and incorporate the excluded values, the mean would be 417.03 lbs. and the median 196 lbs.[9]

This strays far from Offutt's "average" weight of 506 lbs. And the Government provides no explanation of why Offutt excluded weights that he knew from his average calculation, which is especially noticeable considering it would reduce the value of his calculation by nearly 100 lbs. Nor is it clear why he eschewed the median, which is traditionally the more stable value in statistical analyses because it is less affected by outliers. *See, e.g.*, *Fisher v. Dillard Univ.*, 499 F. Supp. 525, 533 n.9 (E.D. La. 1980) ("The median is unaffected by an unusually high or low [value] . . . , while the average will be 'pulled' up or down accordingly.").

In fairness to Offutt's methodology, it is evident that he did not simply count each city delivery as shown by the individualized portion of the spreadsheet, but grouped the deliveries in some capacity. But he fails to explain how some of these weights could be attributed to McGuire, or the

---

[9] In doing so, due to insufficient data, we did not change to the two largest-quantity trips in the chart. This includes a trip that allegedly moved 6,446 lbs. of marijuana. Sargent suggests that "Offutt may have confused the seizure of 6,000 [marijuana] *cigars*" for pounds, incorporating those into the 6,446-lb. drug weight. Some facts support such an interpretation, such as Seward's testimony that 2,100 lbs. was the most he ever put in the van. Offutt attributes triple that quantity to this disputed trip. But other facts cut against Sargent's argument. Namely, the values visible in Exhibit 190 sum up to 489 lbs. Therefore, each marijuana cigar would have to be attributed 0.9928 lbs., a proposition that is not otherwise supported.

origin of his unidentified "twenty-two trips." Indeed, the "conversations with sources" portion of the spreadsheet, which presumably forms the basis of his average, ties none of those trips to a specific driver. And, worse yet, the individualized delivery sheets appear to double-count for pickups and deliveries. Not only could this inflate extrapolated values, but it also gives the false impression that drivers performed additional deliveries.

Recalculating McGuire's numbers showcases the danger of Exhibit 190's inaccuracies. If we take the recalculated values above—a mean of 417.03 lbs. and a median of 196 lbs.,[10] McGuire's extrapolations show that he is responsible for either (1) 9,174.55 lbs. (4,161.58 kg) when utilizing the mean or (2) 4,312 lbs. (1,955.92 kg) when utilizing the median.

This may prompt the question: Would the jury not still use Exhibit 190 to find the defendants each responsible for over 1,000 kg of marijuana? Such an approach wrongly presupposes that Offutt was correct to extrapolate the average value of all drivers to attribute responsibility for drugs to McGuire, despite claiming the value was "unknown" and that any attributed value was a "guesstimate." Offutt's methodology is dubious, and the value may be well lower. The spreadsheet's inaccuracies support such a conclusion. The deliveries, both on pages 24–25 of Exhibit 190 and driver-to-driver, show great variance. For instance, our recalculated values yield a standard deviation of 990.09 lbs. Standard deviation measures "how dispersed the data is in relation to the mean." *Common Terms and Equations*, Nat'l Library of Medicine, https://www.nlm.nih.gov/oet/ed/stats/02-900.html (last visited August 13, 2025). Such a high standard deviation

---

[10] Doing so generously credits the accuracy of Exhibit 190, given the skew created by the 6,446-lb. trip.

24-40109
c/w Nos. 24-40111, 24-40117, 24-40139, 24-40299

shows that extrapolation of that average value is dangerous speculation, especially when it is not paired with reliable explanatory testimony.[11]

Alternatively, Offutt could have considered each driver's quantities to provide a more accurate, individualized metric of responsibility. But he did not.[12] Exhibit 190's underlying documents, as described within the summary, only identified 764 lbs. for which McGuire was responsible (or 1,011 lbs., including the New Mexico seizure). We cannot say that the Government "proved" the existence of this extrapolated weight.

Supplanting known drug quantities with an average value and then extrapolating that number—without any competent explanation regarding the calculation—manufactures evidence of unproven facts. That is error.[13]

### 2.    *Whether the Error Was Clear or Obvious*

For error to be clear and obvious, it cannot be "subject to reasonable dispute." *Puckett*, 556 U.S. at 135. Offutt's spreadsheet has no trustworthy

---

[11] "[T]he general rule of thumb is that there is a 68 percent probability an event will occur within one standard deviation around the mean. There is a 95 percent probability that an event will occur within two standard deviations around the mean." *Otto Candies LLC v. U.S.*, 288 F. Supp. 2d 730, 759 n.233 (E.D. La. 2003). That means that there is a 95% probability that any given trip's quantity falls between 0 lbs. and 2397.21 lbs. despite the average being 417.03 lbs. The variability in the data demonstrates the efficacy of using the median, and the tenuousness of extrapolating a population's data to each individual.

Other facts also introduce tension. Sargent's PSR stated that "each trip required a minimum of $10,000 worth of narcotics." This means that each trip carried a minimum of 100 pounds of marijuana. Even assuming that Offutt's methodology was based on the grouped trip sheet, it is certainly within the realm of possibilities that his average was highly inflated.

[12] And, even if he did, it would require extrapolation of several values across many unknown-quantity drives—a questionable practice.

[13] Of course, some of the values in this analysis would change when considered under Sargent's circumstances. Nevertheless, the various mathematical errors make Exhibit 190's admission equally as erroneous in Sargent's case.

mathematical foundation. It extrapolated over values labeled "unk," or "unknown." This, which was a Rule 1006 "summary" of evidence before the jury, was unquestionably without a sufficient factual predicate.[14]

Evidentiary rules "should be construed so as to administer every proceeding fairly, eliminate unjustifiable expense and delay, and promote the development of evidence law, to the end of ascertaining the truth and securing a just determination." FED. R. EVID. 102. "In criminal cases, the court's 'review of evidentiary rulings . . . is necessarily heightened . . . .'" *Portillo*, 969 F.3d at 168 (quoting *United States v. Anderson*, 933 F.2d 1261, 1268 (5th Cir. 1991)); *Marrero v. City of Hialeah*, 625 F.2d 499, 508 n.10 (5th Cir. 1980) ("It is precisely the function of a judicial proceeding to determine where the truth lies. The ability of courts, under carefully developed procedures, to separate truth from falsity, and the importance of accurately resolving factual disputes in criminal . . . cases are such that those involved in judicial proceedings should be 'given every encouragement to make a full disclosure of all pertinent information within their knowledge.'" (quoting *Imbler v. Pachtman*, 424 U.S. 409, 439–40 (1976) (White, J., concurring))).

So, where the Government produces evidence to convict an individual, speculation is insufficient. Indeed, even if evidence *is* speculative, there must be some factual anchor upon which the Government can rely. Here, that anchor is mathematical accuracy. But the spreadsheet's creator referred to the drug quantities as "guesstimates," and admitted that nobody double-checked his potentially erroneous work. This guesswork—attributing a projected drug quantity to several defendants with questionable accuracy—was wrongly "elevated . . . to the position of evidence." *Spalding*,

---

[14] While some appellants attempted to impeach Offutt by showing that he could not identify the Signal conversations from which the drug quantities originated, neither Sargent nor McGuire, on appeal, truly raises those arguments.

894 F.3d at 185 (quoting *Smyth*, 556 F.2d at 1184 n.12).  The district court should have ensured that it excluded the "argumentative matter" of Offutt's calculations, "lest the jury believe that such matter [was] itself evidence of the assertion it [made]." *Id.* (quoting *Smyth*, 556 F.2d at 1184 n.12).  But it failed to do so.  This error is clear and obvious.

### 3.    Whether Appellants' Rights Were Substantially Harmed

An error affects an appellant's substantial rights where it "affect[s] the outcome of the district court proceedings." *Puckett*, 556 U.S. at 135. (quoting *Olano*, 507 U.S. at 734).  This inquiry depends upon the preferred calculation to determine the quantity of marijuana attributed to each individual.  McGuire and Sargent were convicted of conspiracy to possess marijuana with intent to distribute, and in both of their cases, the jury found that (1) the scope of the conspiracy exceeded 1,000 kg or more of a mixture or substance containing a detectable amount of marijuana, and (2) each defendant "was individually responsible for or could reasonably have foreseen that the conspiracy involved a mixture or substance containing marijuana" exceeding 1,000 kg.

True, various calculations could produce a value exceeding 1,000 kg, including extrapolating based on (1) the average weight of all drivers' known deliveries, (2) each individual driver's mean delivery weight, and (3) each individual driver's median delivery weight. But "[t]he [G]overnment *cannot* use a 'summary' chart under [Rule] 1006 'to assume that which it was required to prove beyond a reasonable doubt as operative facts of the alleged offense.'" *Hart*, 295 F.3d at 459 (emphasis in original) (quoting *Taylor*, 210 F.3d at 316).  That is exactly what the Government did.  It took a few instances of known values to create an unexplained average before extrapolating it to "prove beyond a reasonable doubt . . . operative facts" of

the conspiracy. *Id.* (quoting *Taylor*, 210 F.3d at 316). In doing so, it supplanted known values with the average. This is pure speculation.

"[A]n error affects a defendant's substantial rights only if the error was prejudicial." *United States v. Gonzalez-Rodriguez*, 621 F.3d 354, 363 (5th Cir. 2010). "Error is prejudicial if there is a *reasonable probability* that the result of the proceedings would have been different but for the error." *Id.* (emphasis added). "The probability of a different result must be sufficient to undermine confidence in the outcome of the proceedings." *Id.*

McGuire and Sargent argue that, without Exhibit 190, the jury may have found them responsible for a different quantity of drugs, which, in turn, would produce a different statutory minimum. To be sure, a jury could still independently extrapolate, or the Government could prove independent of Exhibit 190 that each individual was responsible for more than 1,000 kg of marijuana. Such is the case, too, because the jury may quantify based on reasonable foreseeability. But Exhibit 190—a focal point of the evidence in this case—was unreliable, and the jury checked only a general question regarding the individual responsibility. There is a reasonable probability that the proceedings would have produced a different quantity without Exhibit 190.[15] Therefore, Sargent's and McGuire's substantial rights were harmed.

## 4.    Discretion

Finally, we should exercise our discretion on plain-error review where the error seriously affects the fairness or integrity of judicial proceedings. *Puckett*, 556 U.S. at 135. Here, the jury was presented with evidence that

---

[15] Although the jury instructions explained that it was their duty to "determine if [the charts' and summaries'] inferences or conclusions [were] accurate," the trial court still had a gatekeeping duty to ensure that all evidence was accurate. *See* Fed. R. Evid. 104(a) ("The *court* must decide any preliminary question about whether . . . evidence is admissible." (emphasis added)).

purported to "summarize" all of Roberts's texts, including that McGuire and Sargent were each responsible for conspiring to traffic upwards of 10,000 lbs. of marijuana. But "the public legitimacy of our justice system relies on procedures that are neutral, accurate, consistent, trustworthy, and fair, and that provide opportunities for error correction." *Rosales-Mireles v. United States*, 585 U.S. 129, 141 (2018) (citation modified). Sargent and McGuire were attributed responsibility for hypothetical quantities of drugs masquerading as hard evidence. The Government never explained its methodology. Our criminal justice system demands more than that. *See Ramos v. Louisiana*, 590 U.S. 83, 89 (2020) (noting that a person may not be found guilty of a serious crime unless the verdict is returned, "superior to all suspicion" (quoting 4 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 343 (1769)). It cannot be said that, superior to all suspicion, removal of this chart would result in the exact same conviction.[16]

We exercise our discretion carefully. *See Puckett*, 556 U.S. at 135. And while we agree that Exhibit 190's exclusion may result in a different drug quantity, we do not believe it would have impacted the conviction itself. We therefore AFFIRM the drug conspiracy conviction and REMAND for resentencing under the default penalty provision, 21 U.S.C. § 841(b)(1)(D).

### III.   SUFFICIENCY OF THE EVIDENCE — DRUG CONVICTION

Lala raises a similar, but distinct, challenge, arguing that the Government failed to produce sufficient evidence to sustain a conviction. While the Rule 1006 challenge questioned the admissibility of Exhibit 190 — and whether the proceedings would be any different had it not been

---

[16] McGuire alternatively argues that the chart improperly bolstered the testimony of certain co-defendants. The chart does not express an opinion about the witnesses or bolster their testimony, and we therefore reject that argument.

admitted—a sufficiency review asks whether a rational jury could have, with the summary admitted, returned a guilty verdict. As the Government points out, "[f]undamentally, [the appellants] admit that the jury correctly found them guilty of the offense but argue that they are responsible for a smaller quantity of marijuana." So, the sole question is whether a rational jury could have found that each defendant "was individually responsible for or could reasonably have foreseen" that the conspiracy involved over 1,000 kg of marijuana. 21 U.S.C. § 841(a)(1) (prohibiting possession with intent to distribute controlled substances); 21 U.S.C. § 841(b)(2)(A)(vii) (prescribing penalties for distribution of 1,000 kg or more of a substance with a detectable amount of marijuana).

When a defendant timely moves for acquittal, we review a challenge to the sufficiency of the evidence de novo. *United States v. Sanders*, 952 F.3d 263, 273 (5th Cir. 2020). We "must affirm if a 'rational jury, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the offense to be satisfied beyond a reasonable doubt.'" *Id.* (emphasis omitted) (quoting *United States v. Bowen*, 818 F.3d 179, 186 (5th Cir. 2016) (per curiam)). "Nonetheless, 'a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference.'" *Id.* (quoting *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996)). Finally, "[c]redibility determinations and reasonable inferences are resolved in favor of the jury's verdict." *United States v. Thompson*, 647 F.3d 180, 183 (5th Cir. 2011).

Lala details Exhibit 190's flaws—many of which we have already described—arguing that the "506-pound average is not calculated within the record or supported by it." He refers to two exhibits underlying the summary—Government Exhibits 209 and 210, which showcase Signal conversations allegedly between Roberts and drivers regarding their trips. He repeatedly claims that Offutt attributed weights to Lala (and the other

25

defendants) not reflected in the messages. But any challenges to Exhibit 190's propriety were best raised under Rule 1006.[17]

A sufficiency-of-the-evidence challenge considers the same evidence that the jury received. *See United States v. Mendoza*, 522 F.3d 482, 490 (5th Cir. 2008) ("Upon reviewing this evidence, it is important to note that the sole inquiry is not whether the jury's verdict was ultimately correct but whether the jury made a reasonable decision based upon the evidence introduced at trial." (quoting *United States v. Pando Franco*, 503 F.3d 389, 394 (5th Cir. 2007))). We therefore presume Exhibit 190 is admissible, and Lala's arguments about the propriety of the data, its calculations, and its connections to the underlying Signal conversations attack the jury's credibility determinations.

At trial, Lala attempted to impeach Offutt's credibility. During cross-examination, he focused on Exhibits 209 and 210, as he does here, to prove Exhibit 190's inaccuracies. He presented Offutt with those exhibits and asked him to identify the underlying messages. In response, Offutt explained:

_____

[17] Lala appears to have realized that. In his Reply Brief, he changes his argument, contending that the summary chart does not fit within Rule 1006. This deviates from his arguments in his opening brief, and we therefore do not consider the challenge under Rule 1006. *See United States v. Rodriguez*, 602 F.3d 346, 360 (5th Cir. 2010) ("For obvious reasons, our court generally will not consider an issue raised for the first time in a reply brief."). True enough, we have "recognized an exception to this rule whereby we will consider a point of error not raised on appeal when it is necessary 'to prevent a miscarriage of justice.'" *United States v. Whitfield*, 590 F.3d 325, 346 (5th Cir. 2009) (quoting *United States v. Montemayor*, 703 F.2d 109, 114 n.7 (5th Cir. 1983)). But this is not one of those cases. Although Lala may have been successful in challenging Rule 1006 the same as Sargent and McGuire, he also received the safety valve and a downward variance, and the district court stated that it would have sentenced him to the same term of imprisonment if its drug quantity calculations were wrong. *Cf.* Oral Arg., at 23:27–24:12 (Ragle's counsel conceding harmless error as to Rule 1006 because his sentence fell below the statutory maximum and Guidelines range, as Lala's did). This is not a miscarriage of justice warranting application of this exception.

"[I]t's easier to look at Signal on the phone, the actual physical device. When the extraction occurs, it's not as easy to go through, if that makes sense. So, again, this chart was developed from the actual physical phone device." Offutt testified that he "would imagine [that the message was] there, because [he] didn't make that number out of the air." He also stated that another individual did not "double-check[] and match[] the text to the message[s]." Lala made other attempts to impeach Offutt as well.

"The jury retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses." *United States v. Gibson*, 875 F.3d 179, 185 (5th Cir. 2017) (quoting *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012)). In sufficiency-of-the-evidence challenges that rely heavily on credibility questions, "[e]ven 'the "uncorroborated testimony of an accomplice or of someone making a plea bargain with the [G]overnment" can support a conviction.'" *Id.* (quoting *United States v. Chapman*, 851 F.3d 363, 378 (5th Cir. 2017)). Indeed, "all credibility determinations are made in the light most favorable to the verdict." *Mendoza*, 522 F.3d at 488 (quoting *United States v. Moreno*, 185 F.3d 465, 461 (5th Cir. 1999)).

After hearing the testimony—including the impeachment attempts—and considering the evidence, the jury found Lala guilty. Viewing all credibility and evidentiary inferences in the light most favorable to the verdict, we cannot say that no rational jury could reach such a verdict, even with Exhibit 190's inaccuracies. We thus AFFIRM Lala's conviction for conspiracy to possess with intent to distribute over 1,000 kg of marijuana.[18]

---

[18] The Government reads a sufficiency challenge into Sargent's Rule 1006 challenge. Sargent's brief is not clear as to whether he challenges Exhibit 190 under both Rule 1006 *and* the sufficiency of the evidence, or merely the admission of Exhibit 190. He styles Issue I as whether the district court abused its discretion under Rule 1006 in admitting the summary; he then states that "[c]onsequently, the evidence was insufficient" to prove the drug quantity. The use of "consequently" indicates that the

24-40109
c/w Nos. 24-40111, 24-40117, 24-40139, 24-40299

## IV.    Drug Conspiracy and Money Laundering Sentences

Each of McGuire, Sargent, and Lala challenges the factual findings underlying the Guidelines ranges upon which their sentences were premised. Where a criminal defendant preserves a challenge relating to their sentence, this court reviews factual findings for clear error. *United States v. Alford*, 142 F.3d 825, 831 (5th Cir. 1998).  The interpretation and application of the Guidelines, however, is reviewed de novo.  *United States v. Griego*, 837 F.3d 520, 522 (5th Cir. 2016).  "The district court's calculation of the quantity of drugs involved in an offense is a factual determination."  *Alford*, 142 F.3d at 831.  "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole."  *Id.* (quoting *United States v. Sanders*, 942 F.2d 894, 897 (5th Cir. 1991)).

With respect to sentencing issues, "remand is required unless the [G]overnment can establish that the error was harmless."  *United States v. Halverson*, 897 F.3d 645, 651 (5th Cir. 2018).  This requires the Government to demonstrate both "(1) that the district court would have imposed the same sentence had it not made the error, and (2) that it would have done so for the same reasons it gave at the prior sentencing."  *Id.* (quoting *United States v. Ibarra-Luna*, 628 F.3d 712, 714 (5th Cir. 2010)).

Each defendant's pre-sentence investigation report ("PSR") adopted Exhibit 190's chart identifying the predicted quantity of drugs for which each defendant was responsible, and the court adopted the PSR's findings.  A PSR "generally bears sufficient indicia of reliability to be considered as evidence by the trial judge in making the factual determinations

_____

challenge solely falls under Rule 1006.  Moreover, his brief does not cite sufficiency-of-the-evidence standards of review or argue in accordance with such a challenge.  To the extent he raises a sufficiency challenge, he did not sufficiently brief it, and we do not consider it.

required by the sentencing guidelines." *Alford*, 124 F.3d at 831–32 (quoting *Sanders*, 942 F.2d at 898). But to make such a finding, the facts in the PSR must "have an adequate evidentiary basis," and the defendant must not present rebuttal evidence. *Id.* at 832. "[M]ere inclusion in the PSR does not convert facts lacking an adequate evidentiary basis with sufficient indicia of reliability into facts a district court may rely upon at sentencing." *United States v. Rudolph*, 103 F.4th 356, 360–61 (5th Cir. 2024) (quoting *United States v. Melendez*, 57 F.4th 505, 509 (5th Cir. 2023)). And while a defendant's objection, on its own, may not necessarily "serve as rebuttable evidence that the information in the PSR is unreliable, 'such objections may sufficiently alert the district court to questions regarding the reliability of the evidentiary basis for the facts contained in the PSR.'" *Id.* (quoting *United States v. Harris*, 702 F.3d 226, 231 n.3 (5th Cir. 2012)).

The three defendants who raise this issue—McGuire, Sargent, and Lala—have different circumstances and are considered separately.[19]

## A.    McGuire

McGuire challenges his sentence on two grounds. He first asserts that he was not responsible for 5,060 kg of marijuana, largely relying on Offutt's admission that Exhibit 190 may contain errors. Because we agree that the court erred in its drug quantity analysis, we do not consider his unpreserved argument that it alternatively erred by failing to make particularized findings regarding the scope of criminal activity that he agreed to undertake.

---

[19] As described in Part II, *supra*, each of McGuire and Sargent successfully challenged the admission of Exhibit 190 at trial. Although we REMAND for resentencing to remedy that error, that remedy only eliminates the defendants' statutory minima. Their Guidelines ranges, which are premised upon a factual finding of the drug quantity for which they are responsible, remain highly relevant to their ultimate sentences. This issue therefore remains ripe for consideration.

McGuire filed written objections to his PSR, including that it attributed an improper drug quantity by "not provid[ing] a basis for [the] number of trips or [the] quantity of marijuana." He explained that the spreadsheet identified most drug quantities as "unknown," and that it does not demonstrate that he was ever close to the average of 506 lbs. per trip. Finally, he argued that Offutt "admitted on the stand . . . that there were errors" in Exhibit 190.[20] On this basis, McGuire requested that the court find him accountable for between 1,000 and 3,000 kg of marijuana, which would accord with the jury's verdict.

The PSR explained that under U.S.S.G. § 2D1.1 cmt. (n.5), the court shall approximate the quantity of a controlled substance where there is no seizure or the seizure does not reflect the scale of the offense. *See* U.S.S.G. § 2D1.1 cmt. (n.5). It supported compiling all co-conspirators' acts and omissions in the jointly undertaken criminal activity because "the defendant [could] be held responsible for any and all drug amounts within the conspiracy that were reasonably foreseeable, which [was] at least 23,460 kilograms of marijuana." The PSR stated that McGuire, "who was one of the main couriers throughout the conspiracy, was only held accountable for the conservative amount of 5,060 kilograms of marijuana to avoid disparity." The Government adopted this response.

McGuire argues that the only quantity attributable to him was 861 lbs. of marijuana and 500 pens.[21] He also claims that he should not be held accountable for the quantities of marijuana distributed by other drivers because they operated independently of one another, implying that he and

---

[20] This slightly mischaracterizes the record. Offutt admitted that "[t]here *could* be errors."

[21] Again, McGuire's sum is slightly different from our calculations from Exhibit 190. *See supra* p. 18 (calculating his individualized total to be 764 lbs.).

the other drivers were not engaged in jointly undertaken criminal activity. His most pointed argument, however, is that Exhibit 190 does not support that he was responsible for 5,060 kg of marijuana. Unlike at trial, McGuire objected regarding the mathematics underlying Offutt's spreadsheet analysis at sentencing. The court overruled the objection.

It explained that it "sat through the trial and heard all of the evidence," and believed that all the enhancements were appropriate by a preponderance of the evidence. It also found "the information contained in the [PSR] has sufficient indicia of reliability to support its probable accuracy," and therefore adopted its factual findings, undisputed facts, and Guidelines applications.

The extrapolative approach at sentencing is not unprecedented. The Sixth Circuit has allowed sentencing courts to "multiply[] the amount [a co-conspirator] was carrying upon her arrest (387 pounds) by the number of trips she made for [the defendant] (18)." *United States v. Oleson*, 44 F.3d 381, 385 (6th Cir. 1995). It found such estimates "reasonable," "provided [they] are supported by a preponderance of the evidence." *Id.* This, the Sixth Circuit said, was distinguishable from the more stringent burden of proof at trial. *Id.* And true enough, the standard for the district court to find that McGuire was responsible for 5,060 kg of marijuana is far lower than the standard for the jury to convict. But here, the court relied on a summary chart devoid of explanation of the underlying calculations, and speculation that involved replacing *known* drug weights with an average across several drivers. This is not sufficiently reliable.

To be sure, the district court may reach the same conclusion without the Government's chart as adopted by the PSR, or it could find that the chart was sufficiently based on reliable evidence by a preponderance of the evidence. But it reached that conclusion with *no* reasoned explanation of the

31

506-pound average. Offutt never explained how he formed the trips or who was related to each trip. And perhaps the district court, which heard all of the evidence, could determine that the Government demonstrated that McGuire was responsible for over 3,000 kg of marijuana by a preponderance of the evidence on some other basis. But sole reliance on the PSR's adoption of Exhibit 190 is insufficient and is thus clear error absent further consideration of its reliability and accuracy.[22] We therefore VACATE McGuire's sentence and REMAND for reconsideration of his attributable drug weight.[23]

In addition, McGuire argues that Exhibit 190's defects require us to vacate Counts 1 and 3 together, citing *United States v. Biyiklioglu*, 652 F. App'x 274, 277 (5th Cir. 2016) (per curiam), for the proposition that intertwined sentences should be vacated together. We agree. Count 3's money laundering sentence was calculated under U.S.S.G. § 2S1.1(a)(1), which draws its base offense level from "[t]he offense level for the underlying

---

[22] Indeed, as we explained above, different mathematical methodologies produce vastly different quantities for each individual. And these values can alter the sentencing Guidelines by shifting McGuire's Guidelines to U.S.S.G. § 2D1.1(c)(5), which produces a Level 30, instead of (c)(4), which produces a Level 32. And while Offutt's methodology *could* be the one that the court chooses, it needs more information demonstrating the accuracy and reliability of his calculations. That is plainly missing.

Nor are the other facts facially sufficient to support the court's adoption of the PSR values. While Paragraph 8 of the PSR suggests that each trip required a minimum of $10,000 of narcotics, the group charged $100/lb. Therefore, each delivery needed a minimum of 100 lbs., not any greater number.

[23] McGuire separately argues that "[t]he district court ... failed to make particularized findings about the scope of criminal activity that McGuire agreed to undertake in concert with others." We need not reach that argument today; in any event, McGuire "fails to provide any analysis whatsoever on" the district court's alleged error. *United States v. Green*, 964 F.2d 365, 371 (5th Cir. 1992). Cursory references to an issue in a brief on appeal result in waiver of that issue. *Id.* ("Failure to prosecute an issue on appeal constitutes waiver of the issue.").

offense from which the laundered funds were derived." U.S.S.G. § 2S1.1(a)(1). McGuire's PSR identifies Count 1 as the underlying offense for Count 3. Thus, we also VACATE McGuire's sentence on Count 3 and REMAND for resentencing consistent with his resentencing on Count 1. *See United States v. Clark*, 816 F.3d 350, 360 (5th Cir. 2016) (stating that, "[i]n some cases, when we reverse convictions or sentences on fewer than all counts, the aggregate sentence must be unbundled" because "the sentences or counts are interrelated or interdependent").

## B.    Sargent

Sargent objected before the district court "to the number of trips and drug amounts calculated by the case agents," claiming that, "[d]uring the trial, the Government only had specific information on the defendant in the amount of 230.84 kilograms of marijuana." The PSR provided a substantially similar response to that provided in McGuire's case. At sentencing, Sargent reiterated his objection to the way the Government used Signal information to attribute drug weights to individual defendants when "there were times in the trial they could not specifically say who was driving at various locations." The Government adopted the PSR's response, but also noted "that certainly a jury who heard this evidence came back and determined that it was reasonably foreseeable to this defendant of at least 1,000 kilograms of marijuana" and that "the evidence support[ed] that it [was] properly calculated." The court overruled Sargent's objection, stating that it "sat through the trial and [understood] . . . [the] objection" and had "overruled all of" the similar objections made by the other defendants. It explained that it was more likely true than not "based on the way Probation has calculated this and what the PSR contains, and [it] agree[d] that . . . the amounts equalled [*sic*] this." Accordingly, the court adopted and incorporated Probation's response and overruled the objection.

24-40109
c/w Nos. 24-40111, 24-40117, 24-40139, 24-40299

Sargent's sentence raises the very same issues as McGuire's: the Government's use of the misleading summary chart set the baseline for the district court's drug quantity analysis. We therefore VACATE Sargent's sentence on Counts 1 and 3, and REMAND for reconsideration of his attributable drug weight.[24]

## C.    Lala

Finally, Lala applies his sufficiency challenge to sentencing. He "object[ed] to the number of trips and drug amounts calculated by the case agents. During the trial, the Government only had specific information on the defendant in the amount of 855.8 kilograms of marijuana." But he was assigned 2,530 kg of marijuana. Once again, Probation provided a substantially similar response to those provided to each of McGuire and Sargent. The court overruled the objection on drug quantity "based on a preponderance of the evidence," noting that it had "heard all the evidence at trial." It incorporated Probation's response and found that there was "sufficient evidence to support that it[] [was] more likely than not that the drug amounts [were] correct."

But any error was harmless. The district court granted a variance based on Lala's "criminal history, safety valve, [his] role in the offense, [his] acceptance of responsibility, [his] remorse, [his] successful track record on bond before the jury convicted [him], [his] military service, and then also to

---

[24] Although Sargent, unlike McGuire, does not specifically cite authority for treating Counts 1 and 3 as intertwined, he argues that admission of the summary chart requires this court to vacate Counts 1 and 3 together. For the reasons given above with respect to McGuire's sentence, we agree. Because there is no statutory minimum to the default penalty provision, *see* 21 U.S.C. § 841(b)(1)(D), we need not discuss Sargent's challenge to the district court's safety valve determination under 8 U.S.C. § 3553(f). Instead, any determination by the district court to fall below the Guidelines range would take the form of a downward variance or departure.

34

prevent unwarranted sentencing disparities." It then noted "that irrespective if [it was] wrong on the drug amounts, this still [was] the sentence that [the court] would impose for everything that happened in this case." This statement confirms harmlessness, as "the district court would have imposed the same sentence" regardless of the error, and "it would have done so for the same reasons it gave at the prior sentencing." *Halverson*, 897 F.3d at 651. (quoting *Ibarra-Luna*, 628 F.3d at 714). We thus AFFIRM Lala's sentence.

## V.    CONTINUING CRIMINAL ENTERPRISE

Roberts raises two challenges to his CCE charge: (1) his indictment was deficient, and (2) the court constructively amended his indictment.

### A.    Sufficiency of the Indictment

#### 1.    *Standard of Review*

We review a challenge to sufficiency of the indictment de novo. *United States v. Fuchs*, 467 F.3d 889, 900 (5th Cir. 2006). But the issue must be presented to the district court; if the defendant moved on different grounds, then it was not sufficiently presented. *See id.* A motion for judgment of acquittal on the basis of an insufficient indictment may be sufficient. *See United States v. Coppin*, 569 F. App'x 326, 331 (5th Cir. 2014) (not explicitly noting the standard of review, but appearing to review de novo after a party moved for judgment of acquittal on these grounds).

The Government argues that we must review for plain error because "Roberts did not ask the court to dismiss the indictment until he objected to the jury charge, and he never argued that the indictment was deficient

because it was missing elements of the offense charged."[25]  It also argues that he had several opportunities prior to trial to request a bill of particulars or to move to dismiss the indictment, but that he did not do so.

The record belies the Government's argument, and we review the indictment de novo.  True, Roberts never moved for a judgment of acquittal specifically because the indictment was deficient.  But such specificity is not required; rather, a party need only have brought the alleged error to the district court's attention to avoid plain-error review.  *See Fuchs*, 467 F.3d at 900; *United States v. Arnold*, 416 F.3d 349, 355 (5th Cir. 2005) (asking whether the "objection was . . . specific enough to bring [the] alleged error to the court's attention").  The district court expressed concern with the indictment's facial deficiencies several times.

It first raised the issue *sua sponte* on the fourth day of trial while preparing the jury charges.  It explained that a CCE count "requires three predicate drug crimes," but the indictment "only [had] a conspiracy."  In response, the Government said that it would review its research.  On day six, the court asked the Government for an update.  The Government argued that every individual criminal act, charged or uncharged, contributes to a CCE charge.  Roberts countered that all acts within the conspiracy constitute *one* predicate act.  The court responded that it would "continue to look at that."

At the close of the Government's case, Roberts "move[d] for a judgment of acquittal . . . under Rule 29 as to all counts in the Indictment." He offered to be more specific, but the court declined, denying the motion in part and taking the CCE charge under advisement.  Roberts again moved for

_____

[25] Although the Government does not contest that the indictment was insufficient, this determination shifts the burden of demonstrating harmfulness (or harmlessness) of the error.

a judgment of acquittal at the close of evidence, but did not specify that the indictment was deficient. The court denied the motion without reasons, and ultimately explained in its jury instructions that there must have been "at least three violations of the Controlled Substances Act … connected together as a series of related or ongoing activities."

This was clearly presented to the court: it considered the issue several times over the course of the trial and took the issue under advisement after the initial motion for acquittal. This is not the failure-to-present situation for which plain-error review is reserved. We thus review this challenge de novo.

### 2.    *Analysis*

An indictment must "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *Russell v. United States*, 369 U.S. 749, 765 (1962) (quoting *United States v. Carll*, 105 U.S. 611, 612 (1881)). The elements "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *Id.* (quoting *United States v. Hess*, 124 U.S. 483, 487 (1888)). This is a "principle[] of fundamental fairness," *id.* at 765–66, protected by the Fifth Amendment, *see Coppin*, 569 F. App'x at 331. The Federal Rules of Criminal Procedure require "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).

The indictment must "(1) contain[] the elements of the offense charged; (2) fairly inform[] the defendant of the charges he must prepare to meet; and (3) enable[] a defendant to plead an acquittal or a conviction in bar to future prosecutions for the same offense." *United States v. Davis*, 53 F.4th 833, 845 (5th Cir. 2022) (alterations in original) (quoting *United States v. Moody*, 923 F.2d 341, 351 (5th Cir. 1991)). This ensures that the grand jury

finds probable cause that a defendant has committed each element of the offense, as required by the Fifth Amendment. *Id.*

Roberts was charged with CCE under 21 U.S.C. § 848(a). An individual is engaged in a CCE where:

> (1) he violates any provision of this subchapter or subchapter II the punishment for which is a felony [Controlled Substances Act violations], and
>
> (2) such violation is a part of a continuing series of violations of this subchapter or subchapter II—
>
> > (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
> >
> > (B) from which such person obtains substantial income or resources.

21 U.S.C. § 848(c). When returning a verdict, the jury must agree on the specific acts constituting CCE's "continuing series of violations" prong. *See Richardson v. United States*, 526 U.S. 813, 818–20 (1999). This "create[s] several elements, namely the several 'violations.'" *Id.* at 818. By extension, if each continuing violation is its own element, our case law requires the indictment to contain those elements. *See Davis*, 53 F.4th at 845.

The CCE count read as follows:

> That from sometime in or about May 2018, and continuously thereafter up to and including April 14, 2021, in the Eastern District of Texas and elsewhere, [Roberts] did unlawfully, knowingly and intentionally engage in a continuing criminal enterprise in that [he] unlawfully, knowingly and intentionally violated 21 U.S.C. § 846, which violation includes, but is not

38

limited to, the substantive violation alleged in Count One of this First Superseding Indictment, to wit: Conspiracy to Possess with the Intent to Distribute Marijuana, and which violation was part of a continuing series of violations of the Controlled Substances Act, Title 21, United States Code, Section 801, et seq., undertaken by [Roberts] in concert with at least five other persons with respect to whom [Roberts] occupied a position of organizer, supervisor, and any position of management, and from which such continuing series of violations the defendants obtained substantial income and resources. All in violation of 21 U.S.C. § 848(a).

It clearly contemplates one predicate: Count 1. *See* Fed. R. Crim. P. 7(c)(1) ("A count may incorporate by reference an allegation made in another count."). But it fails to provide the other two distinct violations. And a single conspiracy cannot serve as all three predicate violations. *See United States v. Valencia*, 66 F.3d 321, 1995 WL 535093, at *3 (5th Cir. 1995) (unpublished table decision) (explaining that each conspiracy offense is its own predicate drug offense). Unsurprisingly, the Government concedes the failure to sufficiently charge the CCE offense. Instead, it argues that the error was harmless.

For harmless error, we consider "(1) whether the indictment provided [Roberts] sufficient notice of the crime with which he had been charged and (2) whether [Roberts] was harmed by 'losing the right to have the public determine whether there existed probable cause to charge' the missing element." *United States v. Dentler*, 492 F.3d 306, 310–11 (5th Cir. 2007) (quoting *United States v. Robinson*, 367 F.3d 278, 287 (5th Cir. 2004)).

As to the first prong, Roberts argues that the Government consistently represented that the conspiracy count was its only predicate. This is not true. The Government argued that "every criminal action, whether part of the conspiracy or not," can serve as a predicate, and that it could "rely on

violations not charged anywhere in the Indictment in establishing the continuing series of violations." Then, when drafting jury instructions, the Government represented that it could select a substantive violation of a § 841 drug-trafficking crime and a § 843(b) violation of use of a communication facility in a drug-trafficking crime as predicates.

The Government suggests that the indictment sends a clear message that Roberts needed to defend other instances of drug trafficking beyond Count 1. But Roberts was not formally informed of the predicate acts—the Government did not name the predicates until the end of trial. Roberts could not prepare his defense with complete knowledge of the charges against him. And, as he points out, this is not one of the few cases in which the predicates are elsewhere in the indictment such that he had notice of the charges against him. *See, e.g.*, *United States v. Soto-Beniquez*, 356 F.3d 1, 26 (1st Cir. 2003) ("We think it preferable for predicate offenses to be alleged in the CCE count. But, at least where the CCE count incorporates by reference predicate offenses charged elsewhere in the indictment, failure to list predicate offenses in the CCE count itself is not reversible error because the defendant has been provided fair notice.").[26] These new predicate acts— produced to the defense after the evidence had concluded—were not provided to Roberts with "sufficient notice of the crime with which he had been charged." *Dentler*, 492 F.3d at 310.

But we do not only look to formal inclusion of an element in the indictment. We have previously found harmless error where an individual "does not allege that [he] was unaware of the [G]overnment's theory or

---

[26] It is of no moment that Roberts had "roughly 21 months [to] . . . file[] a motion for a bill of particulars or to dismiss the indictment." The Government provides no law suggesting that an individual must move for a bill of particulars or to dismiss, or waive the challenge.

blindsided by the [G]overnment's" introduction of evidence in support of its ultimate theory. *United States v. Suarez*, 966 F.3d 376, 384 (5th Cir. 2020). Roberts does not allege that he was blindsided, nor could he. The predicates—a substantive violation of a drug-trafficking crime and the use of a communication device in support of a drug-trafficking-crime—were proven through the evidence demonstrating conspiracy. And Roberts does not explain how his defense would have been different had the predicates appeared in the indictment.

Instead, he cites *United States v. Adams*, 314 F. App'x 633, 643 (5th Cir. 2009) (per curiam), in which a panel of this court vacated a conviction because the defendant was harmed under the first prong (lack of notice), eschewing consideration of the second. But *Adams* is distinguishable. There, the court explained that it could not "say that it appears beyond a reasonable doubt that the indictment's error did not contribute to Adams's conviction on Count I" because the indictment, on its face, suggested that Adams needed only to mount a defense against accusations of false reports of gross receipts on Line 1 of his Schedule C form, not his accompanying Form 1040X. *Id.* at 642. The court stated that it was "not difficult to imagine that Adams would defend against an alleged falsity on the 1999 Schedule C in a different manner than he would defend against a falsity on the Form 1040X." *Id.* "For one thing, Adams had completed the 1999 Schedule C without the assistance of a paid tax preparer; accountant Smith prepared Adams's Form 1040X." *Id.* The court premised its holding on the defenses' inherent differences. Those differences do not exist here.

Roberts also fails to rebut the Government's argument that a grand jury would have found probable cause for these underlying elements. Under the second prong, we ask whether "any rational grand jury presented with a proper indictment would have charged that [Roberts] committed the offense in question." *Suarez*, 966 F.3d at 384 (quoting *Robinson*, 267 F.3d at 288).

We look no further than the trial evidence to which the grand jury would have had access, including Roberts's communications, introduced through both his physical phone and Signal conversations, and evidence showing his possession with intent to distribute marijuana. A grand jury with this evidence could certainly act rationally in finding probable cause to charge Roberts with a more particularized indictment. We therefore find any insufficiency of his indictment harmless.

## B.     Constructive Amendment

### 1.     *Standard of Review*

Roberts alternatively argues that the court constructively amended the indictment by providing the predicate offenses to the jury in the jury charges. Unlike the insufficient indictment claim, we review the alleged constructive amendment for plain error. During the charge conference, Roberts objected to Count 2's instructions, stating:

> Defendant Roberts objects to the way it is phrased using the violations alleged for the second and third predicate acts of a CCE count being from Count 1, which is the conspiracy to commit -- to violate -- to possess with intent to distribute. And the defense objects that it -- that the count either be dismissed or that the instruction not allow that the two predicate acts are from the exact same language as in Count 1 in the conspiracy.

The objection houses one identifiable argument: that the predicate offenses use the same language as Count 1. This objection to the charge's phrasing, however, does not assert that the court improperly amended the indictment. As described above, plain-error review is appropriate when the alleged error is not brought to the district court's attention. *See Fuchs*, 467 F.3d at 900. This issue was not competently raised, and we review for plain error.

### 2.    *Analysis*

Once a grand jury returns an indictment, its charges may not be broadened except by amendment by a grand jury. *Stirone v. United States*, 361 U.S. 212, 215–16 (1960). A constructive amendment occurs "when an action of either the judge or prosecutor allows the jury 'to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged.'" *United States v. Gonzales*, 436 F.3d 560, 577 (5th Cir. 2006) (quoting *United States v. Holley*, 23 F.3d 902, 912 (5th Cir. 1994)), *overruled on other grounds by United States v. Vargas-Ocampo*, 747 F.3d 299 (5th Cir. 2014) (en banc). In such circumstances, the conviction rests "on a materially different theory or set of facts than that with which she was charged." *United States v. Rider*, 94 F.4th 445, 460 (5th Cir. 2024) (quoting *Thompson*, 647 F.3d at 184). This claim is subject to a harmless-error analysis. *See Dentler*, 492 F.3d at 312.

To succeed, Roberts must show that the difference between the instructions and the indictment caused him "to be convicted of a separate crime from the one for which he was indicted." *Id.* (quoting *United States v. Nunez*, 180 F.3d 227, 231 (5th Cir. 1999)). If he fails to do so, he must "show how the variance in the language between the jury charge and the indictment so severely prejudiced his defense that it requires reversal under harmless error review." *Id.* (quoting *Nunez*, 180 F.3d at 231).

In support, Roberts relies on various distinguishable cases. He cites *United States v. Hoover*, 467 F.3d 496, 501–02 (5th Cir. 2006). There, we reversed a conviction based not on the false statement identified in the indictment, but another. *Id.* at 502 ("[W]hen the [G]overnment chooses to specifically charge the manner in which the defendant's statement is false, the [G]overnment should be required to prove that it is untruthful for that reason."). He looks to *United States v. Chambers*, 408 F.3d 237, 247 (5th Cir.

2005).    But there, the Government failed to demonstrate that the ammunition described in the indictment indeed crossed state lines. *Id.* ("Since there was no evidence that any of the completed rounds distributed by Houston Cartridge Company which appellant possessed had been transported in interstate commerce as alleged in the indictment, appellant's conviction must be reversed."). He points to *United States v. Adams*, 778 F.2d 1117, 1124 (5th Cir. 1985). There, as in *Hoover*, the Government focused on the *wrong* false statement. *Id.* (reversing Adams's conviction after the jury found him guilty of using a driver's license with a false name, but the Government relied on false statements concerning his *residence*).

These cases all carry the common theme of convicting a defendant of a charged act for other activity. In other words, where an indictment charged the defendant with a crime premised on Conduct A, the jury returned a guilty verdict, thanks in part to jury instructions premised on Conduct B, which *could not support* a conviction of a crime based on Conduct A. *See, e.g.*, *id.* True, *Richardson* identifies a CCE's predicates as independent elements. But the instructions did not broaden the charged crime: the grand jury charged him with CCE based on conspiracy to possess with intent to distribute marijuana and related violations of the Controlled Substances Act. The Government incorporated inherently related predicates. This variance did not change the indictment from marijuana to methamphetamine, for instance, which would materially alter the underlying facts. Instead, it incorporated the requisite elements such that the jury could consider the charge. This does not constitute reversal. *See id.* at 1123. Nor has Roberts demonstrated harm as to the variance in the jury instructions.

We therefore AFFIRM Roberts's CCE conviction.

24-40109
c/w Nos. 24-40111, 24-40117, 24-40139, 24-40299

## VI.    Sufficiency of the Evidence — Money Laundering Convictions

Every appellant but Lala challenges his conviction for conspiracy to commit money laundering. When a defendant timely moves for acquittal, we review a sufficiency challenge de novo. *Sanders*, 952 F.3d at 273. We "must affirm if a 'rational jury, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the offense to be satisfied beyond a reasonable doubt.'" *Id.* (emphasis omitted) (quoting *Bowen*, 818 F.3d at 186). "Nonetheless, 'a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference.'" *Id.* (quoting *Pettigrew*, 77 F.3d at 1521). "The evidence need not exclude every reasonable hypothesis of innocence, and the jury is free to choose among reasonable constructions of the evidence." *United States v. Lozano*, 158 F. App'x 632, 639 (5th Cir. 2005) (quoting *United States v. Cano-Guel*, 167 F.3d 900, 904 (5th Cir. 1999)).

The appellants were convicted of violating 18 U.S.C. § 1956(h), conspiracy to commit money laundering. The jury considered the violation under two substantive offenses: domestic concealment money laundering and domestic promotional money laundering. We consider each separately.

### A.    Concealment Money Laundering

18 U.S.C. § 1956(a)(1)(B)(i) prohibits individuals from knowingly transacting proceeds of unlawful activity where the transaction is designed in whole or in part "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i).

In *Cuellar v. United States*, 553 U.S. 550, 557 (2008), the Supreme Court considered the "designed . . . to conceal" element. It interpreted the phrase such "that merely hiding funds during transportation is not sufficient

45

to violate the statute, even if substantial efforts have been expended to conceal the money." *Id.* at 563. In so holding, it focused "on the term 'design.' In this context, 'design' means purpose or plan: *i.e.*, the intended aim of the transportation." *Id.* Ultimately, it held that "*how* one moves the money is distinct from *why* one moves the money. Evidence of the former, standing alone, is not sufficient to prove the latter." *Id.* at 566. Where "the purpose of the transportation was to compensate the leaders of the operation," and "the secretive aspects of the transportation were employed to *facilitate* the transportation," the evidence is not sufficient to demonstrate concealment money laundering. *Id.* at 566–67 (emphasis in original). In *United States v. Brown*, 553 F.3d 768, 787 (5th Cir. 2008), we adopted *Cuellar*, requiring that the defendants "intended to and did make it more difficult for the [G]overnment to trace and demonstrate the nature of [the] funds."

The four appellants argue that the transactions were designed to pay for the narcotics, and any concealment of proceeds just showed *how* those proceeds reached their final destination. The Government, for its part, claims that it would be sufficient for the defendants to be aware of a perpetrator's intent to conceal or disguise the nature or source of the funds. It relies on the fact that "drivers picked up boxes, duffle bags, and shopping bags knowing that they contained drug money" and then "delivered the dirty money [in cash] to Roberts and Simonds." Because the drivers did not track inventory, sign documentation, or use banks, the Government insists that the transactions were designed to conceal the cash.

But the Government does not point us to any record evidence demonstrating that the transactions were designed—that is, that their *purpose* was—to conceal or disguise a listed attribute of the funds. *See Cuellar*, 553 U.S. at 562. During closing, it argued that the drivers used cash proceeds, "rather than financial institutions or Venmo or a money wire, to avoid detection, to conceal and to further the carrying on of the business." But this

fact—and the Government's briefed argument that the cash proceeds were routed away from "financial institutions so that they did not get caught"—is the exact *how* that the Supreme Court explained was insufficient to support a conviction. The drivers hid money in their vehicles, took the proceeds into hotels overnight, and avoided banks or other conventional trackable institutions. But the transaction itself—paying Roberts, Simonds, or the marijuana producers—did not have the fundamental purpose of concealment. *See, e.g., id.* at 566–67 (noting that the evidence was not sufficient to show concealment money laundering where "the purpose of the transportation was to compensate the leaders of the operation," even if there were "secretive aspects" to the transportation); *United States v. Garcia*, 587 F.3d 509, 519 (2d Cir. 2009) ("At bottom, the purpose of the transaction here, as in *Cuellar*, was merely to pay for narcotics.").

Nor is *Brown* to the contrary. There, although the defendants used cash "so that they were not easily tracked," they also made various deposits, often "below ten thousand dollars so as to avoid setting off any reporting requirements that might then lead to unwanted attention concerning the funds' nature." *Brown*, 553 F.3d at 787. The proceeds were "deposited into pharmacy bank accounts in cash, accounts from which the money used in the charged transactions was drawn." *Id.* at 784. There was sufficient evidence in that case to find concealment money laundering. But here, the Government relies only on the parties' use of cash to avoid authorities. That cannot support a conviction for concealment money laundering, so it cannot support conspiracy to commit such money laundering. The Government introduced no evidence suggesting that the funds were destined to somehow be concealed, or that the drivers were aware of such an agreement.

The conspiracy to commit money laundering conviction therefore cannot rest on domestic concealment money laundering.

### B.    Promotional Money Laundering

18 U.S.C. § 1956(a)(1)(A)(i) prohibits domestic promotional money laundering: an individual may not conduct or attempt to conduct a financial transaction, knowing that the property involved therein represents proceeds from unlawful activity, with the intent to promote the carrying on of that same unlawful activity.    To sustain a conviction for promotion money laundering, "the Government must show that the defendant: (1) conducted or attempted to conduct a financial transaction, (2) which the defendant then knew involved the proceeds of unlawful activity, (3) with the intent to promote or further unlawful activity." *United States v. Stanford*, 823 F.3d 814, 849 (5th Cir. 2016) (quoting *Brown*, 553 F.3d at 782).

As an initial matter, "mere subsequent transportation of [illegal] proceeds by car does not constitute a 'financial transaction' within the meaning of the statute." *United States v. Puig-Infante*, 19 F.3d 929, 938 (5th Cir. 1994).    A transaction requires "'a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition' or some action involving a financial institution or its facilities." *Id.* (quoting 18 U.S.C. § 1956(c)(3)).    And where a financial institution or its facilities are not involved, there must be a disposition, or "a placing elsewhere, a giving over to the care or possession of another." *Id.* (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 654 (1961)); *see also Lozano*, 158 F. App'x at 639 ("For purposes of § 1956, a financial transaction can be established by evidence that cash proceeds from drug trafficking are given to the care and possession of another.").

"[T]he [G]overnment must show the transaction at issue was conducted with the intent to promote the carrying on of a specified unlawful activity." *Stanford*, 823 F.3d at 849 (quoting *United States v. Trejo*, 610 F.3d 308, 314 (5th Cir. 2010)).    "[T]he evidence must show that the defendant's

conduct not only promoted a specified unlawful activity but that he engaged in it *with the intent* to further the progress of that activity." *Id.* (emphasis in original) (quoting *Trejo*, 610 F.3d at 314). "[C]ourts have often relied on proof that the defendant was aware of the inner workings of and/or extensively involved in the drug organization responsible for the criminal activity as circumstantial proof that he had the specific intent to promote its unlawful purpose." *Id.* (quoting *Trejo*, 610 F.3d at 315).

With that said, "[t]he statute does not require that one receive proceeds from illicit activity and then funnel them back into the activity; it merely requires that one conduct (or attempt to conduct)" a financial transaction involving the proceeds of unlawful activity, intending to promote the carrying on of that activity. *Id.* at 850. And that bar is low. We have held that "being paid to help further the . . . scheme with proceeds from the sales" is sufficient to demonstrate that a defendant "engaged in promotional money laundering." *Id.*; *see also Lozano*, 158 F. App'x at 639 ("Payment to co-conspirators for their participation in the conspiracy for the purpose of continuing the unlawful activity amounts to 'promoting the carrying on of the unlawful activity.'" (quoting *United States v. Wilson*, 249 F.3d 366, 378 (5th Cir. 2001)). Finally, further purchase of the same controlled substance "clearly promote[s] their illegal activity." *Brown*, 553 F.3d at 786.

The defendants were charged with conspiracy under 18 U.S.C. § 1956(h). Therefore, any argument that the Government did not prove that they actually moved money is unconvincing, unless they can demonstrate that there was no agreement to do so. *See Fuchs*, 467 F.3d at 906 (explaining that for conspiracy to commit money laundering, the Government must show "(1) that there was an agreement between two or more persons to commit money laundering and (2) that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose"); *United States v. Mann*, 161 F.3d 840, 847 (5th Cir. 1998) ("An agreement may be inferred

49

from a 'concert of action.' A conspiracy may exist by tacit agreement; an express or explicit agreement is not required." (footnote omitted) (quoting *United States v. Cardenas*, 9 F.3d 1139, 1157 (5th Cir. 1993)); *see also, e.g.*, *United States v. Marchetti*, 96 F.4th 818, 826 n.9 (5th Cir. 2024) (explaining that while the analysis between a substantive violation and a conspiracy violation is similar, the court should not collapse conspiracy to violate a statute and actual violation thereof).

### 1.    *McGuire*

McGuire argues that, although he transported marijuana, "the [G]overnment did not provide sufficient evidence to prove beyond a reasonable doubt that [he] agreed to give cash collected from selling marijuana 'over to the care or possession of another person.'" His argument that he was "not even involved with the money," is a non-starter. Both McGuire and the Government cite extensively to trial testimony regarding transportation of proceeds. Viewed in the light most favorable to the verdict, we cannot say that no rational jury could find him guilty beyond a reasonable doubt.

First, Seward identified McGuire as a driver and explained that he delivered boxes that smelled of marijuana. Thurman testified that drivers would "pick up currency" and, on those trips, would "meet up with Eric Roberts" at one of his properties to deliver the proceeds. Co-defendant Donald Blanco stated that the drivers were involved with "[m]oney being brought back for cannabis."[27] Simonds explained that the cash would come

---

[27] McGuire highlights Blanco's testimony and an associated exhibit containing texts in which Roberts asked him "not to be buggin [his] driver over the money" because his drivers had "nothing to do with it and [he didn't] discuss biz with the drivers as the less they know the better." Blanco testified that he did not recall the conversation. Reading it

back to Dallas after deliveries. The drivers—including McGuire, whom Simonds identified—"would receive a bundle full of money packaged in different ways" upon delivery. And officers seized $13,000 in cash when they stopped McGuire in New Mexico. Finally, Government Exhibit 212 shows McGuire discussing "paperwork" with Roberts for various deliveries, and McGuire received a photograph of vacuum-sealed cash.

This evidence, taken together, demonstrates McGuire's agreement to transport drug proceeds. He gave the proceeds over to the care of Roberts, knowing that they would cover the trips' expenses. McGuire's knowing involvement in a scheme to distribute illicit proceeds to another individual to promote continued activity is sufficient to sustain his conviction.

### 2.     Roberts

Roberts focuses on the fact that "(1) the money moved in vans to compensate marijuana growers did not become proceeds until the transaction was complete, and (2) the [G]overnment failed to show that proceeds were used to promote further crimes." But as established above, Roberts, as a linchpin of this conspiracy, routinely received drug proceeds at his home and distributed them to the group. Any disposition of the money to Roberts was a transaction. And while Roberts is correct that the Government cited to the transport of money to compensate growers in its closing argument, it also argued that "[t]he drivers . . . had an agreement with Roberts and Simonds to bring back the currency."

Roberts did not adequately brief his second argument—failure to prove promotion of further crimes—though that challenge fails for the reasons provided above. He routinely paid co-conspirators and retained the

_____

in the light most favorable to the verdict, Roberts is explaining to Blanco that drug pricing does not fall within the drivers' duties.

24-40109
c/w Nos. 24-40111, 24-40117, 24-40139, 24-40299

profits. *See Lozano*, 158 F. App'x at 639. Moreover, they used their profits (and agreed to use their profits) to purchase more marijuana.

Finally, Roberts claims that the cash discovered in his safe is not sufficient to demonstrate conspiracy to commit promotional money laundering because there was no nexus between that cash and utilizing it to promote ongoing drug activity. But he admitted that the cash was drug proceeds. That cash, as explained above, promoted the conspiracy. This is sufficient to sustain a conviction.

### 3.    *Ragle*

Ragle admits that he "agreed to deliver marijuana and accept cash payment for it." But he argues that the Government "presented insufficient evidence that [he] had the intent required for domestic promotional money laundering 'to promote or further illegal actions' of the enterprise." Instead, he contends that "[t]he evidence only showed that [he] was a driver for the transportation company involved in this case, [not] how [he] did anything that could be considered promoting or furthering illegal actions of the enterprise." He also cites a Seventh Circuit case vacating a conviction for promotion money laundering where the Government only showed that the defendant received "the proceeds [that a co-conspirator] collected from drugs that had been fronted to him," *United States v. Castro-Aguierre*, 983 F.3d 927, 941–42 (7th Cir. 2020), but concedes that his argument may be foreclosed by our precedent defining transactions.

The Government argues that "there was evidence that [Ragle] had knowledge of the inner workings of the" drug trafficking operation. For instance, he recruited Thurman to serve as another driver. He also admits to accepting cash payment for delivering marijuana and moving drug proceeds. His involvement in and knowledge of the organization is sufficient to sustain his conviction.

52

### 4.    *Sargent*

Sargent argues that the Government failed to demonstrate that he agreed to give cash proceeds to the care of another person. But Sargent was indisputably a driver. And he was present for and encouraged the recruitment of another driver, who was informed that he would present drug proceeds to Roberts. Indeed, Clark testified that Sargent said "that he'd done . . . lots of these types of trips and there was nothing -- to kind of rest assured, there was nothing wrong with it." Clark explained that it was clear "from the context of the conversation . . . that everyone knew that . . . the purpose of the trip was to take marijuana to Buffalo, New York," and "to bring back . . . [p]roceeds from the transaction."

Viewed in the light most favorable to the verdict, this evidence supports a conviction for conspiracy to commit promotional money laundering.

\*       \*       \*

Because the evidence was sufficient to demonstrate that each defendant conspired to commit promotional money laundering, their convictions as to Count 3 are AFFIRMED.[28]

## VII.    Firearm Possession

Roberts argues that the district court erred by not requiring the jury to determine whether he possessed a short-barreled rifle. Where a defendant sufficiently preserves a constitutional claim, the issue is reviewed de novo. *United States v. Curry*, 125 F.4th 733, 737–38 (5th Cir. 2025). The

---

[28] Because we REMAND for amendment of the judgments and PSRs of these four individuals, *see infra* Part VIII, the defendants' money laundering conspiracy judgments shall reflect that domestic promotional money laundering is the only underlying substantive violation.

24-40109
c/w Nos. 24-40111, 24-40117, 24-40139, 24-40299

Government concedes both the preservation of this issue, and that the district court erred. It therefore recommends vacating Roberts's sentence and remanding for resentencing. "[A]ny fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." *Alleyne v. United States*, 570 U.S. 99, 103 (2013). This "enables the defendant to predict the legally applicable penalty from the face of the indictment." *Id.* at 113–14. It is undisputed that Roberts could not do so. We therefore VACATE his sentence on Count 6 and REMAND to the district court for resentencing.

## VIII. Clerical Errors

Each of Roberts, McGuire, Sargent, and Ragle challenges their judgments and PSRs, arguing that the district court (and Probation) wrongly incorporated convictions for conspiracy to commit international money laundering, despite the court's jury instructions narrowing those counts. Where the facts are undisputed, this court reviews Rule 36 motions de novo. *United States v. Mackay*, 757 F.3d 195, 197 (5th Cir. 2014).

The superseding indictment charged the defendants with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), tied to the substantive violations under (a)(1)(A)(i), (a)(1)(B)(i), (a)(2)(A), and (a)(2)(B)(i). These charges cover conspiracy to commit domestic promotional money laundering, domestic concealment money laundering, international promotional money laundering, and international concealment money laundering, respectively. The jury instructions, however, narrowed the indictment to exclude the two international theories. The jury convicted the defendants of conspiracy to commit the domestic violations. But the judgment issued for each defendant suggests that they each violated 18 U.S.C. § 1956(h) by conspiring to commit money laundering in violation of (a)(2)(A)(i) and (a)(2)(B)(i). That identifies conspiracy to commit

54

*international* money laundering, not domestic. Each defendant's PSR made the same mistake.

Federal Rule of Criminal Procedure 36 provides that "the court may at any time correct a clerical error in a judgment, order, or other part of the record, or correct an error in the record arising from oversight or omission." Such errors "exist when 'the court intended one thing but by merely clerical mistake or oversight did another.'" *United States v. Buendia-Rangel*, 553 F.3d 378, 379 (5th Cir. 2008) (per curiam) (quoting *United States v. Steen*, 55 F.3d 1022, 1025–26 n.3 (5th Cir. 1995)). The PSR is a part of the record. *See Mackay*, 757 F.3d at 198–99.

The Government agrees that each defendant's PSR and judgment contains a clerical error, wrongly identifying conspiracy to commit money laundering under (a)(2)(A) and (a)(2)(B)(i), instead of (a)(1)(A)(i) and (a)(1)(B)(i). We therefore REMAND the matter to the district court for correction of these clerical errors in the judgments and PSRs. In doing so, the district court shall only include domestic promotional money laundering as to the conspiracy's underlying substantive violation.

## IX. Venue

Finally, Roberts argues that venue was improper. We review preserved venue challenges de novo. *United States v. Romans*, 823 F.3d 299, 309 (5th Cir. 2016). "After considering the evidence in the light most favorable to the verdict, we will affirm where 'a rational jury could conclude "that the [G]overnment established venue by a preponderance of the evidence."'" *Id.* (quoting *United States v. Thomas*, 690 F.3d 358, 368 (5th Cir. 2012)). Venue for conspiracy is far-reaching: it "can be based on evidence of any single act that initiated, perpetuated, or completed the crime, and circumstantial evidence suffices to establish venue." *Id.* (quoting *Thomas*, 690 F.3d at 369). This is rooted in 18 U.S.C. § 3237, which

"provides that any offense begun in one district, but completed in another, or committed in more than one district, may be prosecuted in any district in which the offense was begun, continued, or completed." *Romans*, 823 F.3d at 309 (citing 18 U.S.C. § 3237(a)). This rule has been upheld "even where it permits trial against defendants in a district they never even set foot in prior to trial." *United States v. Caldwell*, 16 F.3d 623, 624 (5th Cir. 1994).

Roberts "concedes that [his] argument is foreclosed but raises it to preserve further review." *See, e.g.*, *United States v. Garcia Mendoza*, 587 F.3d 682, 687 (5th Cir. 2009) ("[O]ne co-conspirator's travel through a judicial district in furtherance of the crime alleged establishes venue as to all co-conspirators."); *Romans*, 823 F.3d at 310 ("[T]he transportation of drug proceeds is an act in furtherance of a drug conspiracy."). We therefore AFFIRM the district court's venue determination.

## X.    Conclusion

For the foregoing reasons, we AFFIRM IN PART, VACATE IN PART, and REMAND. The dispositions for the individual defendants are as follows:

- As to McGuire, we AFFIRM his convictions for conspiracy to commit promotional money laundering and conspiracy to possess with intent to distribute marijuana, VACATE his sentences for conspiracy to possess with intent to distribute marijuana and conspiracy to commit promotional money laundering, and REMAND for resentencing under the default penalty provision and amendment of clerical errors in his judgment and PSR.
- As to Lala, we AFFIRM his conviction for conspiracy to commit promotional money laundering and his corresponding sentence.

- As to Ragle, we AFFIRM his conviction for conspiracy to commit promotional money laundering and REMAND for amendment of clerical errors in his judgment and PSR.

- As to Sargent, we AFFIRM his convictions for conspiracy to commit promotional money laundering and conspiracy to possess with intent to distribute marijuana, VACATE his sentences for conspiracy to possess with intent to distribute marijuana and conspiracy to commit promotional money laundering, and REMAND for resentencing under the default penalty provision and amendment of clerical errors in his judgment and PSR.

- As to Roberts, we AFFIRM his convictions for conspiracy to commit promotional money laundering and CCE and the district court's venue determination, VACATE his sentence for possession of a firearm in furtherance of a drug trafficking crime, and REMAND for resentencing of the firearm violation and amendment of clerical errors in his judgment and PSR.

Nothing in this opinion is intended to express a view on what rulings the district court should make on remand.